722 A.2d 143

COMMONWEALTH of Pennsylvania, Appellee,

v.

**Joseph KINDLER, Appellant.**

Supreme Court of Pennsylvania.

Submitted Feb. 27, 1998.

Decided Dec. 11, 1998.

Reargument Denied March 15, 1999.

A. Charles Peruto for J. Kindler.

Catherine Marshall, Philadelphia, Robert A. Graci, Harrisburg, for Com.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

### OPINION

NEWMAN, Justice.

Presently before this Court is the appeal of Joseph Kindler (Appellant) from the Order of the Court of Common Pleas of Philadelphia County, which, on August 9, 1996, denied his petition under the Post Conviction Relief Act, 42 Pa.C.S. §§ 9541–9546 (1988) (PCRA). For the reasons that follow, we affirm the Order of that court.

On November 15, 1983, Appellant was convicted by a jury of murder in the first degree,[1] kidnapping,[2] and conspiracy[3] in the killing of twenty-two-year-old David Bernstein. The evidence submitted at trial, as summarized by this Court in *Commonwealth v. Kindler*, 536 Pa. 228, 639 A.2d 1, 5–6 (1994), disclosed that:

On April 2, 1982, the Sound Odyssey store in Lower Moreland Township, Bucks County, was burglarized. A Lower Moreland Township patrol officer noticed a vehicle with its lights out pulling out of the cul-de-sac behind the Sound

1. 18 Pa.C.S. § 2502(a).
2. 18 Pa.C.S. § 2901.
3. 18 Pa.C.S. § 903.

Odyssey at a high rate of speed and further noticed three persons inside the vehicle. Police were able to stop this vehicle, but the driver fled and was not apprehended. The two remaining passengers of this vehicle, Scott Shaw (Shaw), a sixteen-year old juvenile and the victim, David Bernstein (Bernstein) were detained and arrested. While in police custody, Bernstein identified Appellant as the driver of the vehicle and furthermore told the police that the burglary was Appellant's idea and that he would be willing to testify against Appellant and Shaw. This information was then conveyed to the Philadelphia Police, since Appellant lived in Philadelphia, and the police secured a warrant for Appellant's arrest.

The police executed the warrant by going to Appellant's home and, after a struggle, handed Appellant a copy of the warrant which clearly named Bernstein as the informant. Appellant was arrested and charged with the burglary of Sound Odyssey, along with other theft-related offenses at other locations in three counties. Following a preliminary hearing, Appellant was held for court in Montgomery County for the Sound Odyssey theft and Appellant filed a motion to quash the charges against him, claiming that the evidence presented at the preliminary hearing was insufficient. A hearing was scheduled on this motion for July 23, 1982, and the Montgomery County District Attorney's Office obtained an order granting Bernstein immunity so that he could testify at this hearing. Bernstein's attorney informed Appellant's attorney that his client had been immunized for the July 23, 1982, hearing and that, if called to the stand, he would testify.

At the July 23, 1982, hearing Bernstein appeared pursuant to the immunity order but Appellant did not appear, nor did his counsel and the motion to quash was dismissed with prejudice. Trial was set for August 17, 1982, and Bernstein, fearing that Appellant might try to prevent him from testifying, planned to move back home with his parents on July 25, 1983, (sic) according to testimony provided by the victim's mother.

Appellant complained to Shaw and Shaw's girlfriend, Michelle Raifer (Raifer), that he had to get rid of Bernstein because he would testify against him and discussed several plans with them for eliminating Bernstein, including drowning him in the Delaware River. On July 24, 1982, Appellant met with Raifer, who arranged to get her mother's car and to meet Appellant and Shaw. That evening the three met and drove the car to within a block of Bernstein's apartment. Raifer called Bernstein and established that he was home and Appellant instructed Raifer to leave and return to the apartment later in the evening with the car. At this time, Appellant placed an inner tube and flippers into the trunk of the automobile.

Appellant and Shaw then hid in a field near Bernstein's apartment to watch the door. Raifer returned between 2:30 and 2:45 a.m. on July 25, 1982, and Appellant, holding a black baseball bat, met her outside the apartment. Appellant told Raifer to ring the doorbell and to get Bernstein to come outside while Appellant, armed with his baseball bat, hid in the alleyway right next to the door to the apartment building.

Raifer did as she was instructed. Bernstein opened the door and had a conversation with Raifer and after some time Appellant pulled the door fully open, dragging out Bernstein and began beating him over the head with the baseball bat approximately 20 times. Shaw also appeared on the scene and Appellant instructed him to hit Bernstein with an electric prod, which he did five times in the ribs. At this point Bernstein was rendered immobile and Appellant and Shaw dragged their victim to Raifer's waiting automobile, leaving a thirty-foot long trail of blood stains, and threw him into the trunk. Appellant, Raifer and Shaw got into the car and drove with Bernstein still moaning in the trunk, for seven miles to a point on the River Road on the Delaware River. Appellant and Shaw then took Bernstein out of the trunk and as they began to throw Bernstein's body into the river, Appellant told Raifer to drive back to the main road and wait for them. Raifer drove off, but

returned soon to find Appellant and Shaw emerging from the river. All three reentered the automobile and Appellant explained that Bernstein's body wouldn't sink so they had to fill his lungs with water and tie a cinder block around his neck to weigh the body down.

On the way back to Philadelphia, Raifer was instructed to stop the car so that Appellant could throw away the baseball bat, clothes and shoes he and Shaw had used during the murder. These items were tossed into various sewer inlets along Grant Street. The police later recovered the blood-stained baseball bat, shirt, pants and shoes that Appellant wore, and Shaw's t-shirt and shoes.

When the three returned to Appellant's home, they tried to wash the blood stains out of the trunk, using a Styrofoam ice chest to carry out the water. They then broke up the ice chest and threw it and the trunk mat of Raifer's automobile into another sewer inlet. The pieces of broken ice chest and the trunk mat, the swimming suits that Appellant and Shaw were wearing, the inner tube, electric prod and a camouflage shirt that Appellant had worn were all later recovered from this sewer inlet by the police.

There was also testimony provided by one of Bernstein's neighbors (Craig Satinsky) that he heard Bernstein being beaten and a car driving away and that when he came outside to investigate he saw Bernstein's apartment door open with Bernstein's girlfriend sitting there. By this time the girl was hysterical and corroborated Satinsky's suspicion that it was Bernstein that he heard being beaten and dragged off in an automobile. They both went out to the street and saw the trail of blood and Bernstein's girlfriend, Lisa Rothbarth, called the police giving them information which led them to look for Raifer's car. Within a few hours, the police intercepted Raifer at her home and seized the blood-soaked car. Raifer eventually confessed, identified Shaw and Appellant as Bernstein's murderers, and led the police to the various sewer inlets, where as already indicated, they retrieved the various items used in connection with the murder.

On July 26, 1982, at around 7:30 p.m., Bernstein's body surfaced in the Delaware River near River Road. The body had a cinder block tied to its neck. Multiple blows to the head were observed which were later shown by a medical examination to be consistent with blows from a bat and bruises were seen to the chest consistent with being made by the electric prod. The forensic medical examination also revealed that, prior to expiring, Bernstein ingested water and silt. The cause of death was identified as drowning and massive head injuries.

After Appellant's penalty hearing, the jury found two aggravating circumstances; that the victim was a prosecution witness to a felony committed by the Appellant and that the victim was killed for the purpose of preventing his testimony against Appellant in a criminal proceeding (42 Pa.C.S. § 9711(d)(5)), and that the killing was perpetrated in the commission of a felony (kidnapping) (42 Pa.C.S. § 9711(d)(6)). The jury found no mitigating circumstances.

Appellant filed Post–Verdict Motions that were pending when he escaped from the maximum-security block of the Philadelphia Detention Center on September 19, 1984.[4] Because of Appellant's fugitive status, the Commonwealth filed a Motion to Dismiss his Post–Verdict Motions. The trial court held a hearing on this motion, after which it determined that, because Appellant had voluntarily removed himself from the jurisdiction of the court, he had waived his right to have his Post–Verdict Motions considered and, accordingly, granted the Motion to Dismiss. Sentencing was deferred until Appellant was apprehended.

Appellant remained at large until his arrest in Quebec, Canada, on April 26, 1985. He was held in Canadian custody (while he challenged extradition) until October 23, 1986, when he escaped from a Montreal prison by breaking through a skylight and lowering himself thirteen stories to the ground on a rope of bedsheets. A fellow inmate, who was escaping with

4. Appellant apparently made his escape, along with another inmate, through the window of a third inmate's cell where a steel bar had been sawed through and the glass broken.

Appellant, fell from the rope to his death. Subsequently, the television program "America's Most Wanted" aired a story on Appellant, and in September 1988, he was spotted and arrested in New Brunswick, Canada.

Appellant was finally returned to Pennsylvania, and on October 2, 1991, sentenced to death for the murder of David Bernstein. A direct appeal to this Court followed.

On February 9, 1994, this Court affirmed the judgment of sentence.[5] In the Opinion Announcing the Judgment of the Court, Justice Papadakos, writing for a plurality of the Court, determined that the trial court's action in dismissing Appellant's Post–Verdict Motions in response to his escape from custody and flight was not error.[6] Accordingly, we found that the appeal came to us with no allegations of error preserved. However, we did undertake a review of (1) whether sufficient evidence was presented at trial to support Appellant's conviction of murder in the first degree;[7] (2) whether the sentence of death was the product of passion, prejudice or any other arbitrary factor; (3) whether the evidence supported the finding of at least one specified aggravating circumstance; and, (4) whether the sentence was excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record

5. *Commonwealth v. Kindler,* 536 Pa. 228, 639 A.2d 1 (1994).

6. Justice Cappy filed a concurring opinion stating that he would hold that, "the post-verdict motions of an ex-fugitive may be reinstated in the court's discretion if, after being returned to custody, the fugitive can show a compelling reason for having his post-verdict motions heard." *He did find, however, that under the facts of Appellant's case, the trial court possessed full authority to dismiss his post-verdict motions.*

Justice Flaherty (now Chief Justice Flaherty) joined Justice Cappy's concurring opinion and filed his own concurring opinion stating that he would go somewhat further and "require that a compelling reason of the most extraordinary nature be present before the post-verdict motions of an ex-fugitive may be reinstated" *(which reasons were not present in Appellant's case).*

7. The duty to review the sufficiency of the evidence in death penalty cases is self-mandated and stems from *Commonwealth v. Zettlemoyer,* 500 Pa. 16, 454 A.2d 937 (1982), *cert. denied* 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983).

of the defendant.[8] After our review of the record we sustained Appellant's conviction of murder in the first degree and affirmed the sentence of death. *There were no dissents.* The United States Supreme Court denied Appellant's Writ of Certiorari on October 11, 1994.

On January 11, 1996, Appellant filed a PCRA Petition. In it he raised allegations of ineffective assistance of trial and successor counsel, and submitted that as a matter of "fundamental fairness" he should have those claims, as well as claims previously raised in his direct appeal, heard and considered on their merits by the courts of this Commonwealth. The Court of Common Pleas of Philadelphia County (PCRA court) dismissed the Petition without a hearing on April 15, 1996. In its opinion, the PCRA court stated that, since this Court had already decided that Appellant's decision to become a fugitive resulted in the waiver of all issues, he was not entitled to PCRA relief. The PCRA court also noted that Appellant's post-conviction actions manifested his complete contempt for the legal process and also a "conscious intent" not to avail himself of whatever legal review he was entitled to in Pennsylvania. After being denied relief in the lower court, Appellant again decided to invoke Pennsylvania legal process and appealed to this Court.[9]

In this Court, Appellant claims that the dismissal of his PCRA Petition was an abuse of discretion because there was no present connection between his 1984–1991 fugitive status and the PCRA court's ability to review the merits of his claims in his 1996 collateral attack. Distilled to its essence, Appellant has presented a simple issue, that the court below erred in dismissing his PCRA Petition. However, for the reasons explained below, Appellant was ineligible for PCRA relief.

8. This review is mandated by the Sentencing Code, 42 Pa.C.S. § 9711(h).

9. 42 Pa.C.S. § 9546(d), in effect at the time Appellant filed his PCRA Petition, provided that a final order disposing of an Appellant's post-conviction petition in a death penalty case was directly appealable to this Court.

■ To be eligible for PCRA relief a petitioner must establish that his conviction or sentence resulted from one or more of the enumerated errors or defects listed in 42 Pa.C.S. § 9543(a)(2) [10] *and that the issues that he raises have not been previously litigated. Commonwealth v. Crawley*, 541 Pa. 408, 413, 663 A.2d 676, 678 (1995) (emphasis added). An issue has been previously litigated if the highest appellate court in which the petitioner could have had review has ruled on the merits of the issue. *Id.*, 663 A.2d at 678, 42 Pa.C.S. §9544(a)(2). In the instant matter, Appellant's claim was previously litigated in his 1994 appeal to this Court when Appellant challenged the trial court's dismissal of his Post–Verdict Motions and argued that it was an abuse of discretion not to allow him to have his post-trial motions considered once he was recaptured. After our review of Appellant's arguments we found them baseless, and determined that the appeal had come to us "without any allegations of error (direct or collateral) preserved." [11] *Kindler*, 536 Pa. at 234, 639 A.2d

**10.** 42 Pa.C.S. § 9543(a)(2), in effect at the time Appellant filed his PCRA Petition, provided:

That the conviction or sentence resulted from one of the following:

(i) A violation of the Constitution of Pennsylvania or laws of this Commonwealth or the Constitution of the United States which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place.

(ii) Ineffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable determination of guilt or innocence could have taken place.

(iii) A plea of guilty unlawfully induced where the circumstances make it likely that the inducement caused an individual to plead guilty.

(iv) The improper obstruction by Commonwealth officials of the petitioner's right of appeal where a meritorious appealable issue existed and was properly preserved in the trial court.

(v) A violation of the provisions of the Constitution, law or treaties of the United States which would require the granting of Federal habeas corpus relief to a State prisoner.

(vi) The unavailability at the time of trial of exculpatory evidence that has subsequently become available and that would have affected the outcome of the trial if it had been introduced.

(vii) The imposition of a sentence greater than the lawful maximum.

(viii) A proceeding in a tribunal without jurisdiction.

**11.** It is important to note that all six Justices participating in the decision of Appellant's case agreed that Appellant's judgment of sen-

at 3.

This Court's decision in Appellant's direct appeal rested on a firm foundation based, in part, on *Commonwealth v. Passaro*, 504 Pa. 611, 476 A.2d 346 (1984). In *Passaro*, this Court decided that a defendant, whose direct appeal was quashed because of his escape from custody during the pendency of that appeal, was not entitled to have his appeal reinstated following his recapture. In so doing we reiterated that, "a defendant who deliberately chooses to bypass the orderly procedures afforded one convicted of a crime for challenging his conviction *is bound by the consequences of his decision.*" *Id.* at 613, 476 A.2d at 347 (emphasis added). We also emphasized that a defendant's escape operated as a rejection of the legitimate means afforded him for challenging his conviction, and we found no reason that a fugitive's "apprehension, which he in no way intentionally assisted, should entitled him to rights *already forfeited.*" *Id.* at 615, 476 A.2d at 349 (emphasis added).

We also reviewed cases from the United States Supreme Court in making our decision in Appellant's direct appeal, including *Molinaro v. New Jersey*, 396 U.S. 365, 90 S.Ct. 498, 24 L.Ed.2d 586 (1970).[12] In *Molinaro*, the Appellant appealed his state conviction to the Supreme Court, and then became a fugitive while the appeal was pending. The Court dismissed the appeal, stating that the Appellant's flight "disentitled" him from calling upon the resources of the Court for the determination of his claims. *Id.* at 366, 90 S.Ct. 498.

tence should be affirmed. Although Justice Cappy and Justice Flaherty (now Chief Justice Flaherty) wrote separately to suggest that a returned fugitive's post-verdict motions should be reinstated under certain circumstances, both agreed that no such circumstances were present in Appellant's case and that the trial court correctly dismissed Appellant's post-verdict motions.

12. We also cited to *Ortega–Rodriguez v. United States*, 507 U.S. 234, 113 S.Ct. 1199, 122 L.Ed.2d 581 (1993), for the proposition that where there is a connection between a defendant's fugitive status and the appellate process, the sanction of dismissal of the appeal was a reasonable response. The Court in *Ortega–Rodriguez* did, however, remand the matter for a determination of whether a defendant's flight and recapture occurring before his appeal had sufficient connection to his appeal to justify its dismissal.

We noted that, although *Molinaro* was not binding upon us, we did find its logic persuasive and that it aided us in our conclusion that our own courts, when faced with a fugitive defendant, have the right to dismiss pending post-verdict motions. Accordingly, we found that the dismissal of Appellant's post-verdict motions was proper and that the appeal came to us, as previously stated, with no allegations of error (direct or collateral) preserved.

To grant Appellant the relief he requests in his PCRA, an evidentiary hearing on claims already *forfeited* by his flight from captivity, would render meaningless all previous rulings of the trial court and of this Court. Appellant has presented us with no reason to disregard all prior decisions validly and legitimately entered and we will not do so. What we stated in 1994 still holds true:

> [I]t would be anomalous to permit Appellant to prevail on this claim and then to subject the trial court to a remand order requiring it to rule on the merits of these same [issues] which were raised, or which could have been raised, at an earlier time and which could have been addressed had Appellant demonstrated some respect for the trial court and legal process.

*Kindler* at 228, 639 A.2d at 4. Accordingly, we find that the PCRA court did not err in dismissing Appellant's Petition for Relief.[13]

Justice ZAPPALA concurs in the result.

Justice NIGRO concurs in the result.

---

**13.** Appellant also argues that, because this is a capital case, he should be given the benefit of the "relaxed waiver" rule under *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983). This doctrine permits the review of claims in capital cases even if there has been a procedural default in the history of the case. What Appellant misapprehends however, is that it was not a procedural default that precluded review of his claims, but rather his own act of becoming a fugitive that resulted in the forfeiture of the right to review of those claims.