**COMMONWEALTH of Pennsylvania,**
**Appellee,**

v.

**Kymmar COTTON, Appellant.**

Superior Court of Pennsylvania.

Submitted Sept. 23, 1998.
Filed Oct. 12, 1999.

John W. Packel, Asst. Public Defender, Philadelphia, for appellant.

Peter J. Gardner, Asst. Dist. Atty., Philadelphia, for Com., appellee.

---

1. 18 Pa.C.S.A. §§ 6106 and 6108, respective-

Before FORD ELLIOTT and STEVENS, JJ., and CERCONE, President Judge Emeritus.

CERCONE, President Judge Emeritus:

¶ 1 Appellant Kymmar Cotton appeals from the judgment of sentence of eighteen months probation imposed after his conviction for the offenses of carrying a loaded firearm without a license and carrying a loaded firearm on the streets of Philadelphia.[1] We affirm.

¶ 2 The Suppression Court has aptly summarized the facts surrounding Appellant's arrest which were adduced at his suppression hearing held July 17, 1997:

On January 22, 1997, at approximately 6:49 p.m., Philadelphia Police Officer Gary Harrison and his partner were in plainclothes, driving an unmarked vehicle in the 6600 block of Ardleigh Street in Philadelphia. While stopped at the corner of Johnson and Ardleigh Streets, Officer Harrison observed a black Acura Vigor operated by the [Appellant], run through a stop sign while traveling north on Ardleigh Street. (N.T. 7/1[7]/97 p. 5).

At this time, Officer Harrison signaled the car with his lights and siren to pull to the side of the road. (N.T. 7/1[7]/97 p. 6). In addition to the driver, there was another passenger in the car. A uniform (sic) officer was called to the scene. Officer Harrison approached the car and asked the [Appellant], the driver, to produce his license, vehicle registration, and insurance identification. [Appellant] identified himself by name and handed over paperwork for the vehicle. (N.T. 7/1[7]/97 p. 7).

Before asking the [Appellant] to step out of the car, Officer Harrison ran [Appellant's] name and birth date through the N.C.I.C. [1] database which reported that [Appellant] had two outstanding bench warrants. At this point, Officer Harrison and his partner asked [Appellant] to step out of the car and placed

ly.

him under arrest. During a search incident to that arrest, a Lorcin .25 caliber semiautomatic pistol loaded with 7 live rounds was recovered from [Appellant's] coat pocket. (N.T. 7/1[7]/97 p. 8).

[1] "N.C.I.C." refers to the National Crime Information Center.

Suppression Court Opinion, filed 1/13/98 at 1–2 (footnote in original).

■ ¶ 3 Appellant waived his right to a jury trial. The next day he was convicted by The Honorable Lynn B. Hamlin Jr. of the aforementioned offenses and given

2. The Commonwealth avers that Appellant has been a fugitive since September 18, 1997 for failing to report to his probation officer and maintains that we should quash the appeal because of Appellant's fugitive status. The dissent would accept the Commonwealth's argument and quash the appeal.

We decline to quash this appeal however because we are compelled to follow our Supreme Court's clear and unequivocal holding in *Commonwealth v. Deemer*, 550 Pa. 290, 705 A.2d 827 (1997). In *Deemer* the appellant was present for his trial but fled when the jury returned its verdict. The appellant was absent throughout the period for filing of post-sentence motions. He was apprehended and returned to the jurisdiction. He then sought to have his right to file post verdict motions reinstated *nunc pro tunc*. This request was denied by the trial court and the denial was ultimately upheld by the Pennsylvania Supreme Court.

However, our Supreme Court also said expressly in this opinion that:
Returned fugitives should be punished, if appropriate, for violations of court orders or statutes which compel their presence in court, but they should not be punished additionally by forfeiture of their appellate rights.... If [an appellant] becomes a fugitive after an appeal has been filed, his appeal **should be decided** and any fugitive status should be addressed separately.
*Id.* 705 A.2d at 829. (emphasis supplied). Our own Court has interpreted *Deemer* to mean that "fugitive status is not a *per se* waiver nor may it be punished by the negation of constitutional rights. Fugitive status is instead a separate wrong with its own consequences." *Commonwealth v. Ford*, 715 A.2d 1141, 1144 (1998).

Assuming arguendo, that Appellant became a fugitive on September 18, 1997, there is no dispute that Cotton filed his appeal in a timely manner before attaining fugitive status. *Deemer* instructs us that in these circum-

the above referenced sentences. On August 1, 1997 Appellant filed this timely appeal.[2]

¶ 4 On appeal to our Court Appellant presents one issue for our consideration:

[I.] Did not the lower court err in denying a Motion to Suppress physical evidence illegally seized from appellant where appellant, the driver of a motor vehicle, was stopped for a traffic violation by a non uniformed police officer who lacked legal authority to initiate

stances the appeal should be decided and the issue of Cotton's fugitive status should be addressed separately. As an intermediate appellate court, this Court is obligated to follow the precedent set down by our Supreme Court. *Foflygen v. Zemel*, 420 Pa.Super. 18, 615 A.2d 1345, 1353 (1992), *appeal denied* 535 Pa. 619, 629 A.2d 1380 (1993). *See also Commonwealth v. Randolph*, 553 Pa. 224, 718 A.2d 1242, 1245 (1998) ("It is a fundamental precept of our judicial system that a lower tribunal may not disregard the standards articulated by a higher court.")

We note also that *Commonwealth v. Kindler*, 554 Pa. 513, 722 A.2d 143 (1998), cited by the dissent, in no way abrogates the rule of *Deemer*. In *Kindler* the appellant was convicted of murder in 1984 and became a fugitive while his post-trial motions were pending. Upon his return to custody, appellant effectuated a direct appeal which was adjudicated by the Pennsylvania Supreme Court in 1994. At that time the Supreme Court decided, based on the status of the law as it then existed, that the appellant had waived his right to pursue post-trial motions since he fled the jurisdiction. Justice Newman's opinion affirms the trial court's denial of appellant's subsequent PCRA petition which was filed in 1996 because appellant had previously litigated the issue of the denial of his post trial motions in his prior direct appeal. *Id.* at 521, 722 A.2d at 147. The language which the dissent quotes from Justice Newman's opinion affirming the trial court's dismissal of the PCRA is merely her review of the basis for the Supreme Court's disposition of appellant's claim in his direct appeal. As such, it is merely a summary and analysis of the law relating to the effect of fugitive status on post trial motions and appeals as it **then** existed at the time of appellant's direct appeal in 1994. The law has changed since 1994. The rule announced in *Deemer* in 1997 is now the governing principle of law.

such a stop, and where the Commonwealth failed to introduce sufficient evidence at the motion to suppress to establish probable cause for appellant's arrest, presenting only the arresting officer's reliance on hearsay information gathered from a National Crime Information Center radio report that appellant was wanted on two bench warrants, warrants that were neither produced in court nor proven to be valid through competent testimony, in violation of appellants rights under Article 1, § 8 of the Pennsylvania Constitution and the Fourth and Fourteenth Amendments to the United States Constitution.

Appellant's Brief at 3.

¶ 5 We have stated, in prior cases, our standard of review for the denial of a suppression motion as follows:

When we review the ruling of a suppression court, we must determine whether its factual findings are supported by the record. Where the [appellant] challenges an adverse ruling of the suppression court, we will consider only the evidence for the prosecution and whatever evidence for the defense which is uncontradicted on the record as a whole; if there is support on the record, we are bound by the facts as found by the suppression court, and we may reverse that court only if the legal conclusions drawn from those facts are erroneous.

*Commonwealth v. Roman*, 714 A.2d 440, 442 (Pa.Super.1998); *Commonwealth v. Perry*, 710 A.2d 1183, 1184 (Pa.Super.1998). Moreover, as factfinder, it is within the suppression court's sole province to pass on the credibility of witnesses and the weight to be accorded their testimony. *Commonwealth v. Benton*, 440 Pa.Super. 441, 655 A.2d 1030, 1032 (1995). The factfinder is free to believe all, some, or none of the evidence presented. *Id.*

¶ 6 Appellant first argues that Officer Harrison and his partner had no authority to stop him for disregarding a stop sign because they were out of uniform in an unmarked car. Appellant asserts that

"[t]he Motor Vehicle Code of Pennsylvania expressly limits the authority to enforce the Motor Vehicle Code to those police officers who are 'in uniform'." Appellant's Brief at 10. We do not interpret the relevant Motor Vehicle Code provision which authorizes a police officer to make an investigative traffic stop so restrictively.

Section 6308(b) of the Motor Vehicle Code provides:

**(b) Authority of police officer.**— Whenever **a police officer** is engaged in a systematic program of checking vehicles or drivers or has articulable and reasonable grounds to suspect a violation of this title, he may stop a vehicle, upon request or signal, for the purpose of checking the vehicle's registration, proof of financial responsibility, vehicle identification number or engine number or the driver's license, or to secure such other information as the officer may reasonably believe to be necessary to enforce the provisions of this title.

75 Pa.C.S.A. § 6308(b) (emphasis supplied).

¶ 7 Nowhere in the plain language of this statutory section does a requirement appear that a police officer be in uniform to effectuate a traffic stop. It is axiomatic that "[w]hen interpreting a statute words must be given their plain meaning, unless doing so would create an ambiguity, and we must interpret statutes in accordance with the legislative intent." *MacAleer v. MacAleer*, 725 A.2d 829, 832 (Pa.Super.1999). *See also* 1 Pa.C.S. § 1921(a) (stating that when interpreting and construing statutes, the object must be to "ascertain and effectuate the intention of the General Assembly"). Moreover, it is not within the province of an appellate court to add words to a statute where the legislature failed to supply them. *Guinn v. Alburtis Fire Company*, 531 Pa. 500, 503, 614 A.2d 218, 220 (1992). We see no reason to impose such a requirement in the absence of a legislative mandate to do so.

¶ 8 There is no dispute that Officer Harrison and his partner were on duty City of Philadelphia Police Officers, who were acting within the scope of their jurisdiction, when they observed Appellant proceed through the intersection without stopping at the stop sign. Thus, they were unquestionably police officers within the meaning of 75 Pa.C.S.A. § 6308. *See Commonwealth v. Frombach*, 420 Pa.Super. 498, 617 A.2d 15, 19 (1992) ("Traditional police are government employees empowered by statute to enforce all Commonwealth laws[.] Today traditional police in Pennsylvania include state police, municipal police, township police, borough police and county district attorney's detectives"). Officer Harrison and his partner therefore lawfully stopped Appellant's vehicle to investigate the vehicle code violation which they observed. *Commonwealth v. Steinmetz*, 440 Pa.Super. 591, 656 A.2d 527, 528 (1995) ("An officer may conduct a lawful traffic stop if he or she reasonably believes that a provision of the Motor Vehicle Code has been violated.") *See also Commonwealth v. Gommer*, 445 Pa.Super. 571, 665 A.2d 1269 (1995), *appeal denied*, 546 Pa. 676, 686 A.2d 1308 (1996) (off duty

state police officer, though not in uniform, had authority to stop vehicle when she had a reasonable and articulable basis to suspect that the driver was intoxicated.) [3]

■ ¶ 9 Appellant next argues that his arrest by the two officers due to the existence of the outstanding bench warrants was invalid because the Commonwealth did not produce the warrants at his suppression hearing. Appellant asserts that because the Commonwealth failed to produce the warrants, the Commonwealth therefore did not satisfy its burden of demonstrating probable cause to justify Appellant's arrest. We cannot agree.

¶ 10 Appellant relies on three cases to support his argument. *Whiteley v. Warden*, 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971); *United States v. Hensley*, 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985) and *Commonwealth v. Queen*, 536 Pa. 315, 639 A.2d 443 (1994).

¶ 11 In *Whiteley* the appellant was arrested by a police officer in the town of Laramie, Wyoming who was acting on a radio bulletin which named the appellant as an individual who had participated in

**3.** Appellant relies on the case of *Commonwealth v. Price*, 543 Pa. 403, 672 A.2d 280 (1996) as support for his argument that the officers were without authority to stop Appellant's vehicle, however this reliance is misplaced. In *Price* an F.B.I. agent in a vehicle equipped with lights and siren pulled over a motorist who ran through a stop sign. The F.B.I agent displayed his badge to the motorist and told the motorist to remain where he was until the local police arrived. Once the local police arrived they arrested appellant for driving under the influence.

The Supreme Court upheld our Court's decision that the evidence obtained as a result of this arrest should be suppressed. The Supreme Court viewed the F.B.I. agent's actions as an arrest of the motorist. Since F.B.I. agents were not permitted under common law or federal law to arrest for traffic offenses or misdemeanor crimes, the arrest was invalid.

In the case at bar, both police officers did not arrest the Appellant when they pulled him over initially. Their purpose in effectuating the original stop was to investigate the violation of the motor vehicle code which they had

observed. An initial stop of a vehicle to investigate a Motor Vehicle Code violation does not constitute an arrest. *Commonwealth v. Schatzel*, 724 A.2d 362, 365 (Pa.Super.1998) ("Traffic stops, like *Terry* stops, constitute investigative rather than custodial detentions, unless under the totality of circumstances the conditions and duration of the detention become the functional equivalent of an arrest.") quoting *Commonwealth v. Gommer*, 445 Pa.Super. 571, 665 A.2d 1269, 1274 (1995), appeal denied, 546 Pa. 676, 686 A.2d 1308 (1996). *Commonwealth v. Proctor*, 441 Pa.Super. 176, 657 A.2d 8, 11 (1995) ("The usual traffic stop is more analogous to a so called *Terry* stop.")

Moreover, both police officers in the case at bar had express statutory authority to make traffic stops pursuant to 75 Pa.C.S.A. § 6308, stop unlike the F.B.I. agent *in Price*. As discussed, *supra*, both police officers were employed by the City of Philadelphia. Since they observed Appellant proceed through an intersection without stopping, as police officers they had the statutory purview to stop Appellant's vehicle for further investigation. The F.B.I agent in *Price* had no such authority.

the robbery of a number of businesses in another Wyoming county, Carbon County. This radio bulletin was issued after the sheriff of Carbon County had obtained an arrest warrant for appellant and his accomplice from a justice of the peace in Carbon County. The Laramie Police Officer who arrested the appellant relied solely on the radio bulletin to effectuate the arrest.

¶ 12 The Supreme Court however, held that the arrest warrant, which was the subject of the radio bulletin, was not supported by probable cause because the sheriff did not set forth enough operative facts in his complaint to justify the arrest warrant being issued. The Court ruled that, as a consequence, the arrest of the appellant in reliance on the radio bulletin about this defective warrant was invalid as a violation of appellant's constitutional rights under the Fourth and Fourteenth Amendments of the United States Constitution. The Court also rejected the argument that the arrest was valid because the arresting officer reasonably assumed that whoever issued the bulletin had probable cause to direct appellant's arrest. The Court said:

> We do not, of course, question that the Laramie police were entitled to act on the strength of the radio bulletin. Certainly police officers called upon to aid other officers in executing arrest warrants are entitled to assume that the officers requesting aid offered the magistrate the information requisite to support an independent judicial assessment of probable cause. Where, however, the contrary turns out to be true, an otherwise illegal arrest cannot be insulated from challenge by the decision of the instigating officer to rely on fellow officers to make the arrest.

*Id.* 401 U.S. at 568, 91 S.Ct. at 1037, 28 L.Ed.2d. at 313.

¶ 13 In *Hensley* the Supreme Court ruled that an investigatory stop made by a police department, based on a police radio flyer or bulletin issued by another police department, is justified if the flyer or bulletin was based on articulable facts supporting a reasonable suspicion that the wanted person in the flyer committed an offense. The Court said:

> [I]f a police flyer or bulletin has been issued on the basis of articulable facts supporting a reasonable suspicion that the wanted person has committed an offense then reliance on that flyer or bulletin justifies a stop to check identification, to pose questions to the person, or to detain the person briefly while attempting to obtain further information. If the flyer has been issued on the absence of a reasonable suspicion, then a stop in objective reliance on it violates the Fourth Amendment.

*Id.* 469 U.S. at 232, 105 S.Ct. at 682, 83 L.Ed.2d. at 614 (citation omitted).

¶ 14 Our Supreme Court relied on both *Whiteley* and *Hensley* in issuing its decision in *Queen.* In that case a uniformed Philadelphia Police Officer was summoned to the scene by police detectives who had their vehicle parked behind another vehicle. One of the detectives informed the uniformed officer that the driver of the second vehicle, the appellant, "resembled a male wanted for robbery." *Id.* at 318, 639 A.2d at 444. The uniformed officer requested the appellant step out of the vehicle and proceeded to execute a pat down search. The search revealed a gun and the appellant was arrested.

¶ 15 At the suppression hearing the arresting officer and the appellant testified but the detective who provided the officer with the initial information did not testify. The trial court refused to grant appellant's request to suppress the evidence and convicted the appellant on two firearm violations. The refusal of the trial court to suppress the evidence was upheld by our Court.

¶ 16 Our Supreme Court however reversed. Relying on *Whiteley* and *Hensley* the Court reasoned:

The rationale of *Whiteley* and *Hensley* clearly supports the proposition that a stop and frisk may be supported by a police radio bulletin *only* if evidence is offered at the suppression hearing establishing the articulable facts which support the reasonable suspicion. To hold otherwise would permit the government to bypass the protections of the Fourth Amendment and Article I, Section 8, of the Pennsylvania Constitution by always having a second police officer summoned for assistance for the purpose of making the inquiry of a suspect on the basis of an initial police officer's suspicion. At no time would the government have to establish any articulable facts, thus completely emasculating the protections against illegal searches and seizures.

Applying the above principles to this record, it is clear that the suppression court erred in refusing to suppress Appellant's weapon. The suppression court assumed that [the detective] possessed the required facts to conduct an investigatory stop. At the suppression hearing, [the uniformed officer] testified that [the detective] did not tell him any of the pertinent facts from which [the detective] concluded that Appellant was a suspected robber, only that [the detective] believed he was. Therefore, the suppression court did not have a description of the robbery suspect or the circumstances surrounding the robbery. **Without any such information, the suppression court was required to speculate as to whether Officer Bryant had sufficient facts to establish a reasonable suspicion.** Such action clearly violates both the Fourth Amendment of the United States Constitution and Article I, Section 8, of the Pennsylvania Constitution.

*Id.* at 320–321, 639 A.2d at 445–446 (emphasis supplied).

¶ 17 Based on these cases, Appellant argues that "[t]he District Attorney's failure to present the facts underlying the N.C.I.C. radio report makes its evidence insufficient to support a finding of probable cause." Appellant's Brief at 21. Appellant further contends that "the burden was clearly on the District Attorney under *Queen* to establish specific and articulable facts to support or establish the information contained in the N.C.I.C. report." *Id.* at 22. However, we do not read *Queen* to compel such a result.

¶ 18 In *Queen*, the constitutional defect arose because the arresting officer had no facts upon which to suspect that the appellant had committed a robbery other than the detective's bald assertion that the appellant "resembled" someone wanted for robbery. The fact that the detective did not testify at the suppression hearing to the facts giving rise to his belief that appellant had committed a robbery thereby deprived the suppression court of any factual basis to conclude that there was a reasonable suspicion that appellant was wanted for robbery at the time of his arrest.

¶ 19 In the case at bar one of the arresting officers, Officer Harrison, testified at the suppression hearing that he was informed by the police dispatcher of the existence of the two bench warrants for Appellant's arrest according to the N.C.I.C. N.T., Suppression Hearing, 7/17/97 at 7, 17–18. Officer Harrison further testified that he later personally checked on the warrants **himself** and confirmed their existence with both the warrant division of his police department and the Youth Study Center, since one of the warrants was a juvenile warrant. *Id.* at 20. Thus, unlike in *Queen*, the Suppression Court in the instant case was provided, through the officer's testimony which it found credible, a factual basis to conclude that the officer possessed probable cause to arrest the Appellant.

¶ 20 We have previously held that the information contained in a N.C.I.C. report is so inherently reliable that such information is, in and of itself, sufficient to form the basis of a finding of probable cause for

a police officer who receives such information from an N.C.I.C. report to make an on the spot arrest. *See Commonwealth v. Feflie*, 398 Pa.Super. 622, 581 A.2d 636, 642 (1990), *appeal denied*, 528 Pa. 621, 597 A.2d 1151 (NCIC printouts of an outstanding warrant are of sufficient reliability to establish probable cause for arrest without additional warrant); *Commonwealth v. Evans*, 343 Pa.Super. 118, 494 A.2d 383, 388 (1985) (NCIC computer check of license which revealed that vehicle was stolen and used in a criminal act and that occupants were armed was sufficient in and of itself to justify warrantless arrest of appellant); Thus Officer Harrison possessed the probable cause to arrest Appellant, **initially**, based on the N.C.I.C. report. His later personal verification of the information contained within the report, which was the existence of the bench warrants, validated the initial probable cause provided by the report itself.

¶ 21 What is most critical is that the validity of the underlying bench warrants is not in question here, in contrast to *Whiteley* supra, where the underlying arrest warrant which formed the basis of the radio bulletin was shown to be defective because it was issued despite a lack of probable cause.[4] The Suppression Court found Officer Harrison's testimony that he was relying on the N.C.I.C. report of the bench warrants at the time of arrest, as well as his testimony that the bench warrants themselves were valid, to be credible.

Since evaluating the credibility of the witnesses is the exclusive province of the factfinder in a suppression hearing, *Benton, supra*, we are compelled to affirm the Suppression Court's factual determination and conclude that it properly denied Appellant's suppression motion.

¶ 22 Judgment of Sentence affirmed.

¶ 23 STEVENS, J., files a dissenting opinion.

STEVENS, J., dissenting:

¶ 1 Because I believe this appeal should be quashed, I must respectfully dissent.

¶ 2 The record before this Court reveals that after Appellant filed his appeal, he became a fugitive.[5] Because Appellant is an active fugitive, I would find that the applicable rules of appellate procedure and current case law require that his appeal be quashed.

¶ 3 The Pennsylvania Rules of Appellate Procedure expressly provide for the quashing of an appeal where the appellant is a fugitive. Pa.R.A.P.1972(6).[6] Moreover:

"[t]he rationale behind dismissal of an appeal while a convicted defendant is a fugitive from justice rests upon the inherent discretion of any court to refuse to hear the claim of a litigant who, by escaping, has placed himself beyond the jurisdiction and control of the court, and

---

**4.** Appellant does not argue to our Court that the underlying bench warrants mentioned in the N.C.I.C. report, and later determined to be legitimate by Officer Harrison, were invalid.

**5.** The Commonwealth has attached to its appellate brief the affidavit of Edward Poserina, the Associate Director of Operations of the Philadelphia Adult Probation Department, indicating that since September 18, 1997, Appellant has failed to report to his assigned probation officer and is presently considered a fugitive. The affidavit further indicates that on March 18, 1998, judicial "wanted cards" were issued authorizing Appellant's arrest. On April 29, 1998, the Commonwealth filed a "Motion to Quash Appeal of Fugitive," which

was denied, *per curiam*, by a Panel of this Court on June 23, 1998, without prejudice to the Commonwealth's right to again raise the issue before the Panel addressing the merits of the appeal. Appellant's counsel does not dispute the Commonwealth's allegation that Appellant is a fugitive, and there has been no indication that Appellant has been captured or turned himself in to authorities.

**6.** **Pa.R.A.P.1972. Dispositions on Motion**

Subject to Rule 123 (applications for relief), any party may move:

. . .

(6) To continue generally or to quash because the appellant is a fugitive.

hence, might not be responsive to the judgment of the court." *In Interest of Dixon*, 282 Pa.Super. 189, 190, 422 A.2d 892, 893 (1980) (*quoting Commonwealth v. Galloway*, 460 Pa. 309, 333 A.2d 741 (1975)) (supporting citations omitted). *In the Interest of C.G.*, 428 Pa.Super. 314, 630 A.2d 1266, 1268 (1993).

¶ 4   In *Commonwealth v. Harrison*, 289 Pa.Super. 126, 432 A.2d 1083, 1085–1086 (1981), we dealt with an appellant who, "albeit an escapee at one time, is now amenable to the Court's jurisdiction." *Harrison*, 432 A.2d at 1085–1086. We clarified, however, that "if such were not the case the course of action would be clear," *Id.* at 1086 (*citing Commonwealth v. Tomlinson*, 467 Pa. 22, 354 A.2d 254 (1976) (*per curiam*) (appeal dismissed where appellant, subsequent to filing and submission of briefs on appeal, became and remained a fugitive); *In re Dixon*, 282 Pa.Super. 189, 422 A.2d 892 (1980) (appeal dismissed when court learned from the district attorney's office and public defender that appellant was a fugitive); *Commonwealth v. Albert*, 260 Pa.Super. 20, 393 A.2d 991 (1978) (*per curiam*) (appeal quashed due to fugitive status of appellant during pendency of the appeal); *Commonwealth v. Barron*, 237 Pa.Super. 369, 352 A.2d 84 (1975) (*en banc*) (appeal dismissed because of appellant's fugitive status)).

¶ 5   We are also guided by the recent case of *Commonwealth v. Kindler*, 554 Pa. 513, 722 A.2d 143 (1998), involving a convicted murderer who escaped from prison while his post-trial motions were pending. The Commonwealth filed a motion to dismiss the post-trial motions, which the trial court granted, and sentencing was deferred. The fugitive was subsequently captured and sentenced, and he appealed the sentence to the Superior Court. In affirming the sentence, the Court determined that it was proper for the trial court to dismiss the post-verdict motions in response to the appellant's fugitive status. *Kindler*, 554 Pa. at 519, 722 A.2d at 146. The Superior Court again heard the case

when the appellant filed a petition under the Post–Conviction Relief Act (PCRA). In its opinion affirming the dismissal of the appellant's PCRA petition, the Court enunciated the following:

This Court's decision in Appellant's direct appeal rested on a firm foundation based, in part, on *Commonwealth v. Passaro*, 504 Pa. 611, 476 A.2d 346 (1984). In *Passaro*, this Court decided that a defendant, whose direct appeal was quashed because of his escape from custody during the pendency of that appeal, was not entitled to have his appeal reinstated following his recapture. In so doing we reiterated that, "a defendant who deliberately chooses to bypass the orderly procedures afforded one convicted of a crime for challenging his conviction is bound by the consequences of his decision." *Id.* at 613, 476 A.2d at 347.

¶ 6   *Kindler*, 554 Pa. at 522, 722 A.2d at 147. The *Kindler* opinion also explained how the Court was persuaded by the logic of *Molinaro v. New Jersey*, 396 U.S. 365, 90 S.Ct. 498, 24 L.Ed.2d 586 (1970), in which the United States Supreme Court dismissed the appeal of an appellant who had become a fugitive while his appeal was pending, stating that the appellant's flight " 'disentitled' him from calling upon the resources of the Court for the determination of his claims." *Id.* (citation omitted).

¶ 7   In declining to quash the appeal currently before us, the majority cites *Commonwealth v. Deemer*, 550 Pa. 290, 705 A.2d 827 (1997), a case decided prior to *Kindler*. I find the majority's reliance on *Deemer* to be misplaced. Unlike the case at hand, *Deemer* clearly dealt with an appellant who was **no longer a fugitive** at the time of appeal to this Court. In the case *sub judice*, however, Appellant is still a fugitive. The *Deemer* case itself makes it clear that the "returned" status of the appellant is of utmost significance: "**Returned** fugitives should be punished, if appropriate, for violations of court order or statutes which compel their presence in

court, but they should not be punished additionally by forfeiture of their appellate rights." *Deemer*, 550 Pa. at 295, 705 A.2d at 829 (emphasis added). Further, the Court stated:

> [A] fugitive who has **returned** to the jurisdiction of the court should be allowed to exercise his post-trial rights in the same manner he would have done had he not become a fugitive.... In short, a fugitive who **returns** to court should be allowed to take the system of criminal justice as he finds it **upon his return**.

*Id.*, 550 Pa. at 295–296, 705 A.2d at 829 (emphasis added).

¶ 8 For the foregoing reasons, I do not find the rationale of *Deemer* applicable, and I would quash this appeal pursuant to Rule 1972(6) and the applicable cases cited *supra.*[7]

---

**7.** If I felt it was appropriate to reach the merits of this case, I would agree with the majority's affirmation of the sentencing court. As discussed above, however, because I believe the applicable statutory and case law requires us to quash this appeal, I would not reach the merit of the case.