J-S19026-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ALEXIS MEDINA | : | |
| | : | |
| Appellant | : | No. 2583 EDA 2024 |

Appeal from the Judgment of Sentence Entered August 26, 2024
In the Court of Common Pleas of Montgomery County
Criminal Division at No:  CP-46-CR-0003736-2023

BEFORE:  PANELLA, P.J.E., STABILE, J., and BECK, J.

MEMORANDUM BY STABILE, J.:               **FILED AUGUST 21, 2025**

Appellant, Alexis Medina, seeks review of the judgment of sentence entered by the Court of Common Pleas of Montgomery County (suppression court).  Following a non-jury trial, Appellant was found guilty of persons not to possess a firearm (18 Pa.C.S.A. § 6105(a)(1)) and carrying a firearm without a license (18 Pa.C.S.A § 6106(a)(1)).  The suppression court sentenced him to an aggregate prison term of four to eight years, followed by a probationary term of three years.  Appellant now contends on appeal that his convictions must be overturned because the suppression court erroneously denied his motion to exclude from trial the firearm police found on his person during a pat-down search.  We affirm.

The suppression court aptly summarized the material case facts as follows:

3. Norristown Officer Christopher Narkin testified that he has worked for the Norristown Police Department for twenty-seven (27) years, following four (4) years as a law enforcement officer in Delaware County. Officer Narkin is a patrol officer and, at the time of this incident, was a K9 handler.

4. On the morning of June 4, 2023, Officer Narkin responded to a call into dispatch reporting a domestic disturbance, and specifically a female being abused, behind the CVS on West Main Street in Norristown, Montgomery County. The caller also mentioned the possible involvement of a grey car.

5. Upon entering the rear parking lot, Officer Narkin, in full uniform and a marked police vehicle, took note of a grey car and observed a white female in the front driver's seat and a Hispanic male in the front passenger seat.

6. Officer Narkin approached the driver's side of the vehicle to check on the female, explaining to both occupants that he was responding to a call reporting that there was a female being assaulted behind the CVS. The female driver stated that she and her boyfriend were having a verbal argument, and that it was not physical.

7. After ensuring the female was safe, Officer Narkin asked the male passenger for his name, date of birth, and social security number to do a routine warrants check. The male responded that his name was Alexander Torres.

8. Officer Narkin's record check of the given name and date of birth came back with "no record found". The male could not provide a social security number or an ID. When Officer Narkin asked him to write down his name, the male could not spell Alexander. Officer Narkin told the male passenger that lying about who he was is a crime that the male could be charged with. At some point during the encounter, the male told Officer Narkin that his grandmother lived "over that way," pointing toward Lafayette Street.

9. Officer Narkin suspected that the male was lying about his name and believed he had come into contact with him before. However, as there were no injuries, and the female having assured the officer that she was fine, Officer Narkin decided to let it go, closed up the call, and returned to his patrol.

10. As Officer Narkin left the rear parking lot of the CVS, he continued to try to figure out the identity of the male, knowing that he recognized the male passenger from somewhere, and feeling as though the male had gotten one over on him. After pulling over about a half of a block away and, upon reflection, Officer Narkin recalled the name *Alexis Medina* and that he and his brother had lived over towards Lafayette Street where the male had pointed earlier.

11. Officer Narkin testified that prior to 2023, he was familiar with [Appellant] from prior calls to his residence on the west end of Norristown and from other police encounters throughout his twenty-seven years as a Norristown police officer. However, as time had passed since Officer Narkin had last seen [Appellant], he was unsure if the male was [Appellant] or [his] brother, whom Officer Narkin was also familiar with.

12. While sitting in his patrol car, Officer Narkin ran [Appellant's] name through the PennDOT system, and pulled up a photo of the male passenger he had just spoken with. Further, he found [Appellant] had six outstanding arrest warrants. Officer Narkin testified that these were active arrest warrants.

13. After receiving this information, Officer Narkin returned to the rear lot of the CVS where he had encountered the couple, but neither [Appellant] nor the grey vehicle were there.

14. Three (3) days later, on June 7, 2023, while on patrol near Haws Avenue and Main Street in Norristown in full uniform and a marked police vehicle, Officer Narkin once again saw the grey vehicle that he had previously interacted with in the CVS rear parking lot on June 4th. He observed the same white female driver in the driver's seat and an occupant in the passenger's seat that Officer Narkin was unable to see clearly due to the extent the person had their seat reclined. Officer Narkin pulled alongside this parked vehicle and could then identify the passenger as [Appellant].

15. After parking his patrol car, Officer Narkin approached [Appellant] at the passenger side door and asked him to step out of the vehicle. Because [Appellant] appeared like he was going to run, Officer Narkin blocked [Appellant's] path while waiting for additional help to arrive. As Officer Narkin waited, he detained

[Appellant] by handcuffing one of [his] hands to the window frame of the open passenger door to prevent any possibility of [Appellant] fleeing. Officer Narkin did not want to have to chase [Appellant] through the west end of Norristown.

16. Officer Narkin testified that he intended to arrest [Appellant] because he believed [him] to be Alexis Medina, believed that [Appellant] had lied about his identity, and believed that [Appellant] had active arrest warrants according to the warrants check report that he had received on June 4, 2023.

17. Once other officers arrived, Officer Narkin effectuated an arrest. As Officer Narkin began the pat down search incident to arrest, [Appellant] stopped the officer, stating that [Appellant] had a gun that he had found in the woods. Officer Narkin subsequently retrieved a small Walther .25 caliber unloaded pistol without a magazine from one of [Appellant's] pockets.

18. During the Hearing, Officer Narkin testified regarding three (3) of the active bench warrants for [Appellant] that were open at the time of his arrest.

19. During recross examination, Attorney Blevins played a video from June 7, 2023, extracted from Officer Narkin's body camera. In that video, Officer Narkin can be heard calling dispatch for a warrants check, and dispatch responding that they did not have anything on [Appellant].

Suppression Court's Findings of Fact and Conclusions of Law, 4/15/2024, at paras 3-19 (emphasis added, internal citations omitted).

The suppression court relied upon the above facts to conclude that police had reasonable suspicion to detain Appellant moments prior to his arrest, and that police had probable cause to justify Appellant's arrest both due to his open warrants and the false identification he gave to the arresting officer days earlier:

This Court concludes upon a review of the totality of the circumstances that Officer Narkin possessed a reasonable

suspicion that [on June 7, 2023,] criminal activity was afoot and properly blocked the grey vehicle so he could determine the identity of the passenger.

Once Officer Narkin confirmed the passenger's identity to be that of [Appellant], the officer asked him to step out of the vehicle. Officer Narkin testified as follows:

> Because [Appellant] acted like he may *try* to run, and Officer Narkin did not want to have to chase him through the west end of Norristown for his own safety, the officer handcuffed one of [Appellant's] hands to the passenger side car door until backup officers arrived.
>
> Officer Narkin intended to arrest [Appellant] based upon his belief that [he] had provided false identification, and had active arrest warrants according to the check completed on June 4, 2023.

Based on a review of the totality of the circumstances, this Court concludes that Officer Narkin possessed probable cause to arrest [Appellant]. Officer Narkin also testified as follows:

> Once backup officers arrived, Officer Narkin effectuated the arrest. As the officer began his pat down search incident to the arrest, [Appellant] stated that he had a gun in his pocket that he had found in the woods.
>
> Officer Narkin then retrieved a small unloaded pistol without a magazine from one of [Appellant's] pockets. Law enforcement placed [Appellant] into a patrol car and taken to the Norristown Police Department and the firearm was placed into evidence.

The totality of the circumstances provided Officer Narkin with probable cause to arrest [Appellant], thereby validating [Appellant's] detention. Officer Narkin's seizure of the firearm was the result of a permissible search incident to a lawful arrest

*Id.*, at paras. 13-15 (internal numbering omitted).

Following the suppression proceedings, a non-jury trial commenced. Appellant was ultimately found guilty of persons not to possess firearms, and firearms not to be carried without a license. He was then sentenced as outlined above. Appellant timely appealed, and both he and the suppression court complied with Pa.R.A.P. 1925. *See* Suppression Court 1925(a) Opinion, 1/23/2025, at 1-3.

In his brief, Appellants raises one issue, which concerns whether the arresting officer had probable cause to detain him:

> Did the [suppression] court err in denying [Appellant's] Motion to Suppress on the ground that the Commonwealth failed to establish that on June 7, 2023, the arresting officer possessed probable cause to initiate a custodial detention when he handcuffed [Appellant] to the door frame of his car since (1) [Appellant's] conduct on June 4, 2023 did not meet the elements of the offense of False Identification to Law Enforcement Authorities and (2) no legally competent evidence was introduced establishing the existence of outstanding warrants for [Appellant]?

Appellant's Brief, at 3 (suggested answer and numbering omitted).

On review of the denial of a motion to suppress evidence, the following standard applies:

> Our standard of review of a denial of suppression is whether the record supports the trial court's factual findings and whether the legal conclusions drawn therefrom are free from error. Our scope of review is limited; we may consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the court erred in reaching its legal conclusions based upon the facts.

*Commonwealth v. Reppert*, 814 A.2d 1196, 1200 (Pa. Super. 2002) (*en banc*) (internal citations omitted).

Further, "[i]t is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given their testimony." *Commonwealth v. Elmobdy*, 823 A.2d 180, 183 (Pa. Super. 2003). As the factfinder, the suppression court is free to "believe all, part or none of the evidence presented." *Commonwealth v. Benton*, 655 A.2d 1030, 1032 (Pa. Super. 1995). The Commonwealth has the initial burden at the suppression hearing of proving "by a preponderance of the evidence that the evidence was properly obtained." *Commonwealth v. Culp*, 548 A.2d 578, 581 (Pa. Super. 1988); *see also* Pa.R.Crim.P. 581(H) (same).

Both the Fourth Amendment to the United States Constitution and Article 1, Section 8 of the Pennsylvania Constitution, protect citizens from unreasonable searches and seizures. *See Commonwealth v. Rosendary*, 313 A.3d 236, 241 (Pa. Super. 2024). "To be lawful, an arrest must be supported by probable cause." *Commonwealth v. Easter*, 331 A.3d 675, 680 (Pa. Super. 2025) (citing *Commonwealth v. Heidelberg*, 267 A.3d 492, 499 (Pa. Super. 2021) (*en banc*)). The existence of probable cause may be determined from the totality of the circumstances, and where an officer arrests an individual without the requisite level of suspicion, the evidence seized pursuant to the arrest is inadmissible at trial. *See Easter*, 331 A.3d at 680.

"Probable cause to effectuate an arrest exists when the facts and circumstances within the knowledge of the arresting officer are reasonably trustworthy and sufficient to justify a person of reasonable caution in believing that the arrestee has committed an offense." ***Commonwealth v. Romero***, 673 A.2d 374, 376 (Pa. Super. 1996). The issue of probable cause must be assessed by a court "through the eyes of the trained police officer, taking into consideration that probable cause does not involve certainties, but rather 'the factual and practical considerations of everyday life on which reasonable and prudent [people] act.'" ***Id***. (quoting ***Interest of D.W.***, 629 A.2d 1387, 1388 (Pa. Super. 1993)). Once an individual is lawfully arrested, police may conduct a pat-down search of his or person. ***See Romero***, 673 A.2d at 377.

In the present case, we hold that the totality of the circumstances supports the suppression court's finding that Officer Narkin lawfully arrested Appellant on June 7, 2023.[1] First, the officer had probable cause that Appellant had committed the offense of providing false information to law enforcement. Second, the arrest was justified by Appellant's outstanding fine and cost warrants.

---

[1] Since the arresting officer had probable cause to support Appellant's arrest, it is unnecessary for this Court to delineate whether the circumstances amounted to an investigative detention, which would have to be justified under the less stringent reasonable suspicion standard. ***See generally Commonwealth v. Ellis***, 549 A.2d 1323, 1332 (Pa. Super. 1988) (distinguishing an investigative detention from a custodial detention/arrest based on the extent of coercive conditions in which the subject is detained).

A person commits the offense of furnishing an officer with false identification by giving incorrect information about his or her identity "after being informed by a law enforcement officer who is in uniform or who has identified himself as a law enforcement officer that the person is the subject of an official investigation of a violation of law." 18 Pa.C.S.A. § 4914(a).

Here, Officer Narkin encountered Appellant on June 4, 2023, having been dispatched to his location in the rear parking lot of a convenience store so that he could investigate a potential instance of domestic abuse. *See* Suppression Hearing, 2/14/2024, at 6. The officer was fully uniformed, and he was operating a marked police vehicle. *See id*.

When the officer entered the parking lot, he observed the vehicle described in the dispatch report; the officer also observed a woman and a man (Appellant) inside the vehicle. The officer made contact with both occupants and gave them the reason for his presence – a report of possible domestic abuse. *See id*., at 7-8. Further, the officer told Appellant that giving a false name was a "crime that he can be charged with." *Id*., at 9. While the officer suspected that the name given by Appellant, "Alexander Torres," was not correct, he decided that since the woman appeared not be injured or in immediate need of assistance, he would "let it go[.]" *Id*.

Moments after leaving the convenience store, however, the officer deduced Appellant's true identity, and confirmed that his name was "Alexis Medina" after running it through "the PennDOT system, which gives you

driver[']s license photos[.]". **See id**., at 10.[2] The officer then drove back to the convenience store to apprehend Appellant, but by the time he returned, Appellant was no longer there. **See id**. At that point, the officer had probable cause that Appellant had committed the offense of providing false identifying information.

Just four days later, the officer encountered Appellant again, observing him in the same vehicle he had been occupying in the convenience store parking lot. As the officer had probable cause that Appellant had committed a criminal offense, the custodial detention was lawful, as was the subsequent pat-down search for weapons once the arrest was underway.

In addition to having probable cause that Appellant had violated section 4914(a), the officer also was authorized to take him into custody due to the outstanding warrants for his arrest. The officer testified at the suppression hearing that he personally looked up Appellant's real name in the PennDOT system on June 4, 2023, and saw there were six outstanding warrants for failure to pay fees and costs to local district courts. **See id**., at 11. The Commonwealth corroborated that testimony by producing print-outs of local district court dockets showing three such arrest warrants in effect at the time of the arrest on June 7, 2023. **See id**. at 11-16.

_____

[2] "PennDOT" refers to the Pennsylvania Department of Transportation.

Appellant now argues that the evidence concerning the existence of those warrants was insufficient to establish the legality of his arrest. More specifically, Appellant contends that the record could not support a finding of probable cause because the officer's testimony alone was insufficient, and the Commonwealth only introduced copies of district court dockets as to three warrants. *See* Appellant's Brief, at 15-16.

We find this argument to be unavailing. The arresting officer testified that he learned of Appellant's outstanding warrants when he personally looked up his name in the PennDot computer system. Further, the officer testified with respect to the underlying basis for those warrants – unpaid fines and costs due to local district courts. Appellant did not offer any evidence refuting the existence of those three warrants.

In analogous cases, this Court has rejected arguments similar to those raised now by Appellant. This Court, for example, upheld a finding of probable cause where the "Commonwealth presented evidence pertaining to the facts and circumstances known to the officer at the time of the arrest." ***Commonwealth v. Galendez***, 27 A.3d 1042, 1047 (Pa. Super. 2011) (*en banc*). In other words, an officer's "knowledge that a person has an outstanding warrant and is wanted for questioning is sufficient to give a police officer probable cause to make a warrantless arrest." ***Id***., at 1044.

Where an officer has testified to such facts based on his or her own knowledge or experience, and the suppression court has credited that

testimony in finding the arrest was supported by probable cause, this Court will not disturb that credibility determination. *See id*., at 1046-47; *see also Commonwealth v. Cotton*, 740 A.2d 258, 265 (Pa. Super. 1999) (upholding finding of probable cause for warrantless arrest where court credited officer's testimony that he relied on computer report of bench warrants at time of arrest, as well as officer's belief that the warrants were valid). Thus, because Appellant's arrest on June 7, 2023, was supported by probable cause, the suppression court did not err in denying his motion, and the judgment of sentence must be upheld.[3]

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 8/21/2025

---

[3] We note that in cases where a purported warrant was insufficient to justify a defendant's arrest, the reason was that the Commonwealth failed to present (a) testimony of a witness with direct knowledge of the warrant, or (b) any documentary evidence confirming that the warrant existed. *See e.g., Commonwealth v. Easter*, 331 A.3d 675, 684 (Pa. Super. 2025). Such cases are distinguishable from the present matter because Officer Narkin testified that he reviewed the warrants himself after looking up Appellant's name in his patrol vehicle's computer. Further, the Commonwealth submitted documentary evidence of three of the warrants at the suppression hearing.