639 A.2d 1

COMMONWEALTH of Pennsylvania, Appellee

v.

Joseph KINDLER, Appellant.

Supreme Court of Pennsylvania.

Argued Jan. 27, 1993.

Reargued Oct. 18, 1993.

Decided Feb. 9, 1994.

Reargument Denied April 8, 1994.

A. Charles Peruto, Sr., and Burton A. Rose, Philadelphia, for J. Kindler.

Catherine Marshall and George S. Leone, Philadelphia, for the Com.

Robert A. Graci, Harrisburg, for Atty. Gen.

Before NIX, C.J., and LARSEN, FLAHERTY, ZAPPALA, PAPADAKOS, CAPPY and MONTEMURO, JJ.

### OPINION ANNOUNCING THE JUDGMENT OF THE COURT

PAPADAKOS, Justice.

On November 15, 1983, Joseph Kindler (Appellant) was convicted by a jury before the Honorable John A. Geisz of the Court of Common Pleas of Philadelphia County of murder of the first degree, kidnapping and criminal conspiracy. As required by the Sentencing Code, 42 Pa.C.S. § 9711, a sentencing hearing was held, and the same jury determined that two aggravating circumstances existed, i.e., that the victim (22 year old David Bernstein) was a prosecution witness to a felony committed by the defendant and that the victim was killed for the purpose of preventing his testimony against Appellant in a criminal proceeding (42 Pa.C.S. § 9711(d)(5)), and that the defendant committed the killing while in the perpetration of a felony (kidnapping) (42 Pa.C.S. § 9711(d)(6)).

The jury did not specifically find that any mitigating circumstances were present, and, as required by the Sentencing Code, 42 Pa.C.S. § 9711(c)(1)(iv), fixed a sentence of death on November 16, 1983.

Post-verdict motions were then filed on Appellant's behalf, but before these motions could be disposed, on September 19, 1984, Appellant escaped from the maximum security block of the Philadelphia Detention Center and became a fugitive from justice. The Commonwealth filed a petition to dismiss the post-verdict motions because of Appellant's status as a fugitive from justice, and Judge Geisz held a hearing on the petition following which he determined that because Appellant had voluntarily removed himself from the jurisdiction of the court, he waived whatever rights he might have had to have his post-verdict motions considered and disposed. The petition was granted and formal sentencing was deferred until such time as Appellant would be returned to Pennsylvania.

Appellant remained at large until April 26, 1985, when he was arrested near St. Adele in the Province of Quebec, Canada, on criminal and immigration charges. On July 3, 1985, the United States requested Appellant's extradition which was granted on January 17, 1986, by the Minister of Justice. Appellant sought to review that decision in the Canadian Courts and, once again, during the review process, Appellant escaped from the Parthenais Prison in Montreal on October 23, 1986, and remained a fugitive for almost two years, until after information on Appellant was broadcast on a television program "America's Most Wanted." Appellant was spotted and arrested in St. John, Province of New Brunswick and returned to custody in September 1988. The Supreme Court of Canada ultimately affirmed the decision of the Minister of Justice (*Kindler v. Canada (Minister of Justice)* [1991] 2 S.C.R. 779, 8 C.R. (4th) 1, 11–12, 22, 25, 30, 33–35), on September 26, 1991, and Appellant was returned to Philadelphia that day.

Following his return, Appellant was sentenced to death on

October 2, 1991, and this direct appeal followed.[1]

At the outset, we must determine whether the trial court's action in dismissing Appellant's post-verdict motions as a response to Appellant's escape from custody and flight while these post-verdict motions were being considered was error. Appellant argues that it was an abuse of discretion to dismiss his post-verdict motions and allegations of ineffective assistance of counsel or not to allow him to have these motions considered once he was recaptured and returned to Pennsylvania. Furthermore, he asks that these motions be considered at this time and that the record in this matter be remanded to the trial court so that it can fulfill its duty to dispose of his post-verdict motions on the merits.

As a general rule, we have concluded that defendants who are fugitives from justice during the appellate process have no right to any appellate review, even though they have been recaptured and returned to the custody of Pennsylvania. *Commonwealth v. Passaro*, 504 Pa. 611, 476 A.2d 346 (1984). This rule is applicable to capital cases, and would normally require that we dismiss the various allegations of ineffective assistance of trial counsel, prosecutorial misconduct, and trial court error that a defendant would normally wish to raise on a direct review of a death sentence.

Here, however, Appellant's fugitive status did not take place during the pendency of an appeal before us. Rather, it took place while the trial court was considering Appellant's post-verdict motions and the question becomes whether the trial court has authority to dismiss such motions as a response to an Appellant's flight. The United States Supreme Court has recently reviewed its own case law which permits its appellate courts to dismiss pending fugitive appeals and has reaffirmed the principle that where there is a connection between a defendant's fugitive status and the appellate process, the sanction of dismissal of the appeal is a reasonable response.

1. The trial court also imposed a consecutive sentence of ten to twenty years of imprisonment for Appellant's conviction of kidnapping (18 Pa.C.S. § 2901) and a concurrent five to ten year sentence for his criminal conspiracy conviction (18 Pa.C.S. § 903).

*Ortega–Rodriguez v. United States,* 507 U.S. ——, 113 S.Ct. 1199, 122 L.Ed.2d 581 (1993).

This rule, like our counterpart to it, rests in part on a recognition that one who invokes the jurisdiction of a tribunal and then flees has voluntarily waived or disentitled himself to call upon the resources of the Court for a determination of his claims. *Molinaro v. New Jersey,* 396 U.S. 365, 366, 90 S.Ct. 498, 498–99, 24 L.Ed.2d 586, 587–88 (1970); *Commonwealth v. Passaro,* 504 Pa. 611, 476 A.2d 346 (1984). The Court in *Ortega–Rodriguez* made it clear that the reasoning of *Molinaro* is equally applicable in federal district courts and authorizes the district court to fashion an appropriate response to the contemptuous disrespect manifested by flight, to protect its own dignity.

■ While *Ortega–Rodriguez* and *Molinaro* are not binding on us, their logic is persuasive and compel us to conclude that our trial courts, when faced with a defendant in fugitive status, also have every right to fashion an appropriate response which can include the dismissal of pending post-verdict motions. Our review of that action is limited to determining whether the flight has a connection with the court's ability to dispose the defendant's case and whether the sanction imposed in response to the flight is reasonable under the circumstances.

■ Here, Appellant submitted post-verdict motions for the trial court to consider but rather than allowing the judicial process to take its course Appellant chose to escape and flee. Appellant's voluntary absence at this stage of the proceedings invites a response of dismissal, firstly, to allow the court to move on to the cases of others whose whereabouts are known and who are in a position to appeal from the court's order disposing of their case and, secondly, as a means of allowing the trial court to defend its own dignity, by sanctioning an act of defiance that occurred solely within its domain.

The connection to the trial court process is real because Appellant's conduct demonstrated absolute disrespect for the legal process and for the authority of the court and we conclude that the action taken in dismissing the post-verdict

motions was a reasonable response to Appellant's "flouting" of the authority of the court and is, therefore, affirmed.

Accordingly, we cannot permit Appellant to resurrect his post-verdict motions, various allegations of ineffective assistance of trial counsel, prosecutorial misconduct and trial court error at this time, thereby, allowing him to benefit from his contemptuous disrespect for the trial court. Furthermore, it would be anomalous to permit Appellant to prevail on this claim and then to subject the trial court to a remand order requiring it to rule on the merits of these same post-verdict motions and other collateral claims which were raised, or which could have been raised, at an earlier time and which could have been addressed had Appellant demonstrated some respect for the trial court and legal process.

Thus, this appeal comes to us without any allegations of error (direct or collateral) preserved, much like those cases where an Appellant either choses not to raise any issues related to the trial and sentencing hearing [2] or as in those cases where the Appellant is a fugitive during the appellate process.

In *Commonwealth v. Judge*, 530 Pa. 403, 609 A.2d 785 (1992), we noted that when we review the death sentence of a fugitive from justice, because of the mandatory nature of our review of all death sentences under our Sentencing Act, we will exercise a limited review, which is confined to determining: 1) whether sufficient evidence was presented at trial to support the conviction of murder of the first degree; [3] 2) whether the sentence of death is the product of passion prejudice, or any other arbitrary factor; 3) whether the evidence fails to support the finding of at least one specified aggravating circumstance; and, 4) whether the sentences are excessive or disproportionate to the penalty imposed in similar

**2.** *Commonwealth v. Heidnik,* 526 Pa. 458, 587 A.2d 687 (1991); *Commonwealth v. Appel,* 517 Pa. 529, 539 A.2d 780 (1988).

**3.** The duty to review the sufficiency of the evidence in death penalty cases is self-mandated and stems from *Commonwealth v. Zettlemoyer,* 500 Pa. 16, 454 A.2d 937 (1982), *cert. denied* 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983), and is conducted regardless of whether the Appellant raises the sufficiency of the evidence as an issue.

cases, considering both the circumstances of the crime and the character and record of the defendant.[4]

With these limitations in mind, we begin by reviewing the record to determine whether sufficient evidence was presented to support the jury's verdict of murder of the first degree. In reviewing the sufficiency of the evidence, we are guided by the well-established principle that we view the evidence and all the reasonable inferences drawn therefrom, in the light most favorable to the Commonwealth as the verdict winner, to determine whether sufficient evidence was presented to enable the jury to find every element of the crime beyond a reasonable doubt. *Commonwealth v. McNair*, 529 Pa. 368, 603 A.2d 1014 (1992); *Commonwealth v. Bryant*, 524 Pa. 564, 574 A.2d 590 (1990). Applying this standard, we can easily conclude that evidence sufficient beyond a reasonable doubt exists in this record to support the jury's verdict of murder of the first degree.

4. The Sentencing Act provides:—
(h) Review of death sentence.—
(1) A sentence of death shall be subject to automatic review by the Supreme Court of Pennsylvania pursuant to its rules.
(2) In addition to its authority to correct errors at trial, the Supreme Court shall either affirm the sentence of death or vacate the sentence of death and remand for further proceedings as provided in paragraph (4).
(3) The Supreme Court shall affirm the sentence of death unless it determines that:
(i) the sentence of death was the product of passion, prejudice or any other arbitrary factor;
(ii) the evidence fails to support the finding of at least one aggravating circumstance specified in subsection (d); or
(iii) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant.
(4) If the Supreme Court determines that the death penalty must be vacated because none of the aggravating circumstances are supported by sufficient evidence or because the sentence of death is disproportionate to the penalty imposed in similar cases, then it shall remand for the imposition of a life imprisonment sentence. If the Supreme Court determines that the death penalty must be vacated for any other reason, it shall remand for a new sentencing hearing pursuant to subsections (a) through (g).
42 Pa.C.S. § 9711(h)

The evidence submitted at trial discloses that on April 2, 1982, the Sound Odyssey store in Lower Moreland Township, Bucks County, was burglarized. A Lower Moreland Township patrol officer noticed a vehicle with its lights out pulling out of the cul-de-sac behind the Sound Odyssey at a high rate of speed and further noticed three persons inside the vehicle. Police were able to stop this vehicle, but the driver fled and was not apprehended. The two remaining passengers of this vehicle, Scott Shaw (Shaw), a sixteen-year old juvenile and the victim, David Bernstein (Bernstein) were detained and arrested. While in police custody, Bernstein identified Appellant as the driver of the vehicle and furthermore told the police that the burglary was Appellant's idea and that he would be willing to testify against Appellant and Shaw. This information was then conveyed to the Philadelphia Police, since Appellant lived in Philadelphia, and the police secured a warrant for Appellant's arrest.

The police executed the warrant by going to Appellant's home and, after a struggle, handed Appellant a copy of the warrant which clearly named Bernstein as the informant[5]. Appellant was arrested and charged with the burglary of Sound Odyssey, along with other theft-related offenses at other locations in three counties. Following a preliminary hearing, Appellant was held for court in Montgomery County for the Sound Odyssey theft and Appellant filed a motion to quash the charges against him, claiming that the evidence presented at the preliminary hearing was insufficient. A hearing was scheduled on this motion for July 23, 1982, and the Montgomery County District Attorney's Office obtained an order granting Bernstein immunity so that he could testify at this hearing. Bernstein's attorney informed Appellant's attor-

---

5. The Affidavit of Probable Cause served on Appellant stated in pertinent part:

After being advised of his Miranda Warnings David Bernstein admitted his involvement in the burglary of Sound Odyssey and when questioned about the third person observed in the truck stated it was Joseph Kindler. David Bernstein said he and Joseph Kindler entered the building by a rear window. David Bernstein stated that Joseph Kindler was the operator of the vehicle when it left the scene of the burglary at Sound Odyssey.

ney that his client had been immunized for the July 23, 1982, hearing and that, if called to the stand, he would testify.

At the July 23, 1982, hearing Bernstein appeared pursuant to the immunity order but Appellant did not appear, nor did his counsel and the motion to quash was dismissed with prejudice. Trial was set for August 17, 1982, and Bernstein, fearing that Appellant might try to prevent him from testifying, planned to move back home with his parents on July 25, 1983, according to testimony provided by the victim's mother.

Appellant complained to Shaw and Shaw's girlfriend, Michelle Raifer (Raifer), that he had to get rid of Bernstein because he would testify against him and discussed several plans with them for eliminating Bernstein, including drowning him in the Delaware River. On July 24, 1982, Appellant met with Raifer, who arranged to get her mother's car and to meet Appellant and Shaw. That evening the three met and drove the car to within a block of Bernstein's apartment. Raifer called Bernstein and established that he was home and Appellant instructed Raifer to leave and return to the apartment later in the evening with the car. At this time, Appellant placed an inner tube and flippers into the trunk of the automobile.

Appellant and Shaw then hid in a field near Bernstein's apartment to watch the door. Raifer returned between 2:30 and 2:45 a.m. on July 25, 1982, and Appellant, holding a black baseball bat, met her outside the apartment. Appellant told Raifer to ring the doorbell and to get Bernstein to come outside while Appellant, armed with his baseball bat, hid in the alleyway right next to the door to the apartment building.

Raifer did as she was instructed. Bernstein opened the door and had a conversation with Raifer and after some time Appellant pulled the door fully open, dragging out Bernstein and began beating him over the head with the baseball bat approximately 20 times. Shaw also appeared on the scene and Appellant instructed him to hit Bernstein with an electric prod, which he did five times in the ribs. At this point Bernstein was rendered immobile and Appellant and Shaw

dragged their victim to Raifer's waiting automobile, leaving a thirty-foot long trail of blood stains, and threw him into the trunk. Appellant, Raifer and Shaw got into the car and drove with Bernstein still moaning in the trunk, for seven miles to a point on the River Road on the Delaware River. Appellant and Shaw then took Bernstein out of the trunk and as they began to throw Bernstein's body into the river, Appellant told Raifer to drive back to the main road and wait for them. Raifer drove off, but returned soon to find Appellant and Shaw emerging from the river. All three re-entered the automobile and Appellant explained that Bernstein's body wouldn't sink so they had to fill his lungs with water and tie a cinder block around his neck to weigh the body down.

On the way back to Philadelphia, Raifer was instructed to stop the car so that Appellant could throw away the baseball bat, clothes and shoes he and Shaw had used during the murder. These items were tossed into various sewer inlets along Grant Street. The police later recovered the blood-stained baseball bat, shirt, pants and shoes that Appellant wore, and Shaw's t-shirt and shoes.

When the three returned to Appellant's home, they tried to wash the blood stains out of the trunk, using a styrofoam ice chest to carry out the water. They then broke up the ice chest and threw it and the trunk mat of Raifer's automobile into another sewer inlet. The pieces of broken ice chest and the trunk mat, the swimming suits that Appellant and Shaw were wearing, the inner tube, electric prod and a camouflage shirt that Appellant had worn were all later recovered from this sewer inlet by the police.

There was also testimony provided by one of Bernstein's neighbors (Craig Satinsky) that he heard Bernstein being beaten and a car driving away and that when he came outside to investigate he saw Bernstein's apartment door open with Bernstein's girlfriend sitting there. By this time the girl was hysterical and corroborated Satinsky's suspicion that it was Bernstein that he heard being beaten and dragged off in an automobile. They both went out to the street and saw the trail of blood and Bernstein's girlfriend, Lisa Rothbarth, called

the police giving them information which led them to look for Raifer's car. Within a few hours, the police intercepted Raifer at her home and seized the blood-soaked car. Raifer eventually confessed, identified Shaw and Appellant as Bernstein's murderers, and led the police to the various sewer inlets, where as already indicated, they retrieved the various items used in connection with the murder.

On July 26, 1982, at around 7:30 p.m., Bernstein's body surfaced in the Delaware River near River Road. The body had a cinder block tied to its neck. Multiple blows to the head were observed which were later shown by a medical examination to be consistent with blows from a bat and bruises were seen to the chest consistent with being made by the electric prod. The forensic medical examination also revealed that, prior to expiring, Bernstein ingested water and silt. The cause of death was identified as drowning and massive head injuries.

Raifer's direct, eyewitness testimony was more than sufficient for a jury to conclude beyond a reasonable doubt that Bernstein's death was a homicide. The Crimes Code defines murder of the first degree as, "[a] criminal homicide ... committed by an intentional," i.e., "willful, deliberate and premeditated killing." 18 Pa.C.S. § 2502(a), (d). From the use of a deadly weapon on a vital part of the body, the jury could infer that the killing was intentional and malicious. *Commonwealth v. Rolan*, 520 Pa. 1, 549 A.2d 553 (1988). From the manner of the killing, the jury could conclude that the killing was premeditated and the jury could conclude that Appellant committed the crime from the direct evidence linking him with the crime. Accordingly, we are more than satisfied that sufficient evidence exists in this record to support the jury's verdict of murder of the first degree.

At the penalty hearing, immediately following the verdict, the jury found the existence of the following aggravating circumstances: that the victim was a prosecution witness to a felony committed by the defendant and was killed for the purpose of preventing his testimony against him in a criminal proceeding involving that offence, 42 Pa.C.S. § 9711(d)(5); and

240

that the defendant committed the killing while in the perpetration of a felony. 42 Pa.C.S. § 9711(d)(6).

The evidence the jury heard established that Bernstein was subpoenaed as a witness by the Commonwealth for the Sound Odyssey burglary and that Bernstein was granted immunity so that he could testify against Appellant at the July 23, 1982, motion to quash proceeding. There was also direct testimony from Raifer that Appellant had to get rid of Bernstein so that he could not testify against him, and evidence that Appellant knew Bernstein had incriminated him because Appellant read the probable cause section of the arrest warrant for him where Bernstein specifically named Appellant as the perpetrator of the burglary at the Sound Odyssey. Finally, burglary is a felony, 18 Pa.C.S. § 3502. All of this evidence is sufficient to establish beyond a reasonable doubt that Bernstein was a prosecution witness to a felony (burglary) committed by Appellant, and that Appellant had the fully formed animus to eliminate Bernstein as a potential witness in the pending criminal proceeding involving the burglary of the Sound Odyssey. Such a killing of a witness constitutes just the type of frontal assault upon the criminal justice system which we have indicated that 42 Pa.C.S. § 9711(d)(5) seeks to address, *i.e., Commonwealth v. Henry*, 524 Pa. 135, 569 A.2d 929 (1990); *Commonwealth v. Appel*, 517 Pa. 529, 539 A.2d 780 (1988); *Commonwealth v. Lark*, 518 Pa. 290, 543 A.2d 491 (1988), and we conclude that this aggravating circumstance was properly found by the jury.

The sentencing jury also determined that sufficient evidence existed to find the presence of aggravating circumstance six, namely, that Appellant committed the killing while in the perpetration of a felony. 42 Pa.C.S. § 9711(d)(6). Appellant was found guilty of kidnapping Bernstein, which is demonstrated for our purposes where a person unlawfully confines another for a substantial period in a place of isolation with the intent to facilitate the commission of a felony or to inflict bodily injury. 18 Pa.C.S. § 2901(a)(2) and (3). Here the jury heard direct evidence that Appellant incapacitated

Bernstein by clubbing him twenty times in the head, then stuffing him into the trunk of a car borrowed for the specific purpose of driving this victim to the river so his body could be disposed. The seven mile, one way ride, was part of Appellant's plan to kill Bernstein and facilitated the commission of the murder. There is no reason to disturb this finding.

In addition, since no mitigating circumstances were found which outweighed the aggravating circumstances, pursuant to 42 Pa.C.S. § 9711(c)(1)(iv), the jury was required to fix the penalty at death, and correctly returned death as its sentence.

We have studied this record and conclude that the sentence of death, being mandated, is neither excessive nor disproportionate to the penalty imposed in similar cases. See *Commonwealth v. Frey*, 504 Pa. 428, 475 A.2d 700 (1984); *cert. denied*, 469 U.S. 963, 105 S.Ct. 360, 83 L.Ed.2d 296 (1984) (and Appendix attached thereto).

Finally, after our review of this record, we conclude that the sentence of death was a product of the evidence and not a product of "passion, prejudice or any other arbitrary factor." 42 Pa.C.S. § 9711(h)(3).

Accordingly, we sustain the conviction of murder of the first degree and affirm the sentence of death.[6]

LARSEN, J., did not participate in the decision of this case.

FLAHERTY, J., files a concurring opinion and joins the concurring opinion authored by CAPPY, J.

ZAPPALA, J., joins the concurring opinion authored by CAPPY, J.

CAPPY, J., concurs in the result reached by the majority and also filed a concurring opinion in which FLAHERTY and ZAPPALA, JJ., join.

Senior Judge MONTEMURO was an appointed Justice of

---

**6.** The Prothonotary of the Supreme Court of Pennsylvania is directed to transmit the full and complete record of the trial, sentencing hearing, imposition of sentence and review by this Court to the Governor. 42 Pa.C.S. § 9711(i).

the Court at the time of argument.*

CAPPY, Justice, concurring.

I write separately to express my disagreement with the rationale of *Commonwealth v. Passaro*, 504 Pa. 611, 476 A.2d 346 (1984), and my continued disagreement with the holding of *Commonwealth v. Judge*, 530 Pa. 403, 609 A.2d 785 (1992) (Cappy, J., dissenting). However, I am constrained to concur in the plurality's present result under the unique facts of the case *sub judice.*

In *Passaro*, this Court held that an appellant, by becoming a fugitive after having been convicted and sentenced, had forfeited his right to have his appellate claims considered. While I agree that it is proper to quash the appeal of a fugitive pursuant to Pa.R.A.P. 1972(6), when the individual is still an active fugitive, I would hold that such an appeal may be reinstated in the court's discretion if, after being returned to custody, the fugitive-appellant can show a compelling reason for having his claim heard. See *Commonwealth v. Passaro*, 504 Pa. 611, 476 A.2d 346, 349–350 (1984) (Zappala, J., concurring in the result). In *Judge*, this Court held that the rationale employed in *Passaro* extended to individuals who had become fugitives after having been both convicted of first-degree murder and sentenced to death, to the extent that the appellant had waived his right to appellate review of all issues excepting those guaranteed under 42 Pa.C.S.A. § 9711(h), and the issue of sufficiency of the evidence. *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983) *reh'g denied.*

I would emphatically state that Appellant's absence before sentencing had little or no direct effect on his appellate rights.[1] Though not controlling, the recent United States

* MONTEMURO, J., is sitting by designation as Senior Justice pursuant to Judicial Assignment Docket No. 94 R1800, due to the unavailability of LARSEN, J., see No. 127 Judicial Administration Docket No. 1, filed October 28, 1993.

1. Appellant's absence indirectly affected his appellate rights in that it resulted in his failure to preserve issues raised in post-verdict motions which were at that time properly dismissed because of Appellant's

Supreme Court's decision in *Ortega–Rodriguez v. United States,* —— U.S. ——, 113 S.Ct. 1199, 122 L.Ed.2d 581 (1993), is persuasive in our analysis. *Ortega–Rodriguez* held that the appeal of a fugitive, who had escaped before sentencing, but has since been recaptured, may not be dismissed by an appellate court unless the actions of the accused had some impact on the appellate process. However, under the instant facts, I am constrained to agree that the *trial court* possessed full authority to dismiss Appellant's post-verdict motions by virtue of Appellant's escape and absence while those motions were pending.

However, contrary to my brethren in the plurality, I would expressly hold that the post-verdict motions of an ex-fugitive may be reinstated in the trial court's discretion if, after being returned to custody, the fugitive can show a compelling reason for having his post-verdict motions heard. This conclusion parallels that of Mr. Justice Zappala as stated in his dissent in *Passaro,* that the appeal of an ex-fugitive should be reinstated in the appellate court's discretion if, after being returned to custody, the fugitive-appellant can show a compelling reason for having his claim heard.

FLAHERTY and ZAPPALA, JJ., join this concurring opinion.

FLAHERTY, Justice, concurring.

I join the concurring opinion authored by Mr. Justice Cappy, but would go somewhat further perhaps and require that a compelling reason of the *most extraordinary nature* be present before the post-verdict motions of an ex-fugitive may be reinstated. Although not present in this case, there could be circumstances which would make mechanical adherence to a *per se* rule inconsistent with Anglo–American notions of fairness and justice, especially where one has been sentenced to death.

---

absence. Obviously, an issue not properly raised in post-verdict motions is not properly preserved for appellate review, must be considered waived, and may not be considered on appeal.