**PRECEDENTIAL**

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 03-9010 & 03-9011
_____

JOSEPH J. KINDLER

Appellant in
No. 03-9011,

v.

MARTIN HORN, Commissioner, Pennsylvania Department
of Corrections;
\*DAVID DIGUGLIELMO, Superintendent of the State
Correctional
Institution at Graterford; JOSEPH P. MAZURKIEWICZ,
Superintendent
of the State Correctional Institution at Rockview,

Appellants in
No. 03-9010

(\*Amended - See Clerk's Order dated 1/6/05)

_____

Appeal from the District Court
for the Eastern District of Pennsylvania
(Civil Action No. 99-cv-00161)
District Judge:  Honorable J. Curtis Joyner
_____

Argued October 12, 2010
On Remand from the Supreme Court of the United States
December 8, 2009

BEFORE:  McKEE, *Chief Judge*, FUENTES, and
STAPLETON, *Circuit Judges*

1

(Opinion Filed:  April 29, 2011)

Leigh Skipper, Esq.
Jennifer L. Givens, Esq.
Matthew C. Lawry, Esq. (**ARGUED**)
Billy H. Nolas, Esq.
Maria Pulzetti, Esq.
Stephen L. Marley, Esq.
Federal Community Defender Office
The Curtis Center, Suite 545 West
Independence Square West
Philadelphia, PA 19106-0000

*Counsel for Apellee/Cross-Appellant*

Ronald Eisenberg, Esq. (**ARGUED**)
David Curtis Glebe, Esq.
Thomas W. Dolgenos, Esq.
Joseph E. McGettigan III, Esq.
R. Seth Williams, Esq.
Philadelphia District Attorney's Office
Three South Penn Square
Philadelphia, PA 19107-3499

*Counsel for Appellant/Cross-Appellees*

_____

OPINION OF THE COURT
_____

FUENTES, *Circuit Judge*.

In 1983, a state court jury convicted Joseph Kindler of killing a witness against him and recommended a sentence of death.  Following his trial, but before the death sentence had been formally imposed, Kindler filed several post-verdict motions.  Before those motions could be heard, Kindler escaped from custody, was captured, escaped again, and was finally arrested and returned to Philadelphia in 1991.  Kindler's efforts to reinstate his post-verdict motions upon his return were unsuccessful, and his judgment of conviction was

2

thereafter affirmed, based on Pennsylvania's fugitive forfeiture doctrine. *Commonwealth v. Kindler*, 639 A.2d 1, 3 (Pa. 1994) ("*Kindler I*"); *Commonwealth v. Kindler*, 722 A.2d 143, 146-48 (Pa. 1998) ("*Kindler II*"). On review of his petition for habeas relief, we agreed with the District Court that the state's forfeiture rule did not provide an adequate basis to bar federal habeas review. *Kindler v. Horn*, 291 F. Supp. 2d 323, 343, 351 (E.D. Pa. 2003) ("*Kindler III*"); *Kindler v. Horn*, 542 F.3d 70, 78-80 (3d Cir. 2008) ("*Kindler IV*"). After granting certiorari, the Supreme Court vacated our decision and remanded the case, concluding that a state procedural rule is not automatically inadequate and unenforceable just because the state rule is discretionary rather than mandatory. *Beard v. Kindler,* 130 S. Ct. 612, 618 (2009) ("*Kindler V*"). Kindler now argues on remand that Pennsylvania did not apply a discretionary rule, but, instead, applied a mandatory rule that represented a break from past decisions. We agree and, for the following reasons, we will affirm in part and reverse in part the District Court's order.

I.

Kindler's case is well-known. In 1982 he burglarized a store in Pennsylvania with Scott Shaw and David Bernstein and was captured by the police. He escaped. Meanwhile, Bernstein fingered Kindler as the mastermind of the burglary and offered to testify against both Kindler and Shaw. Kindler was then arrested and released on bail. While out on bail he devised and carried out a plan to prevent Bernstein from testifying. Working with Shaw's girlfriend, Michelle Raifer, Kindler lured Bernstein from his apartment, brutally struck him over the head twenty times with a baseball bat, jabbed him five times in the ribs with an electric prod, dragged Bernstein's immobilized body into Raifer's car, and drove to the banks of the Delaware River, where Kindler wrapped a cinder block around Bernstein's neck and threw him into the water.

A jury found Kindler guilty of murder and recommended a death sentence. Afterwards, Kindler filed post-verdict motions in which he argued, among other things, (1) that the instructions given to the jury created a reasonable likelihood that, when deciding on whether to recommend the

death penalty, the jury believed it could only consider mitigating circumstances if those circumstances were unanimously agreed upon and (2) that the prosecutor had engaged in misconduct by improperly vouching for the evidence against him. While those motions were pending, on September 19, 1984, Kindler organized an effort to saw through the external bars of his prison, escaped, and fled to Canada. Approximately seven months later, he was arrested, once again, for burglary. Once again, he was imprisoned. And, once again, he escaped, this time through an organized effort in which Kindler's fellow inmates hoisted him up to the roof through a skylight, where he rappelled down the side of the prison using a rope made of bed sheets. A fugitive for two more years, Kindler was finally identified by Canadian viewers of the television program "*America's Most Wanted*" and arrested in September 1988. He contested extradition and was not returned to Pennsylvania until September 16, 1991.

Kindler returned to find that, at the request of the Commonwealth, the trial judge had dismissed his post-verdict motions on account of his escape. Kindler filed a motion to reinstate those motions. In an oral ruling, the Court of Common Pleas denied the motion, finding that "the defendant did voluntarily remove himself from the Detention Center by escaping and loses all rights and privileges for post-trial motions." S.A. 63. In October 1991, Kindler's death sentence was formally imposed. On appeal, the Pennsylvania Supreme Court affirmed the trial judge's decision to deny his motion to reinstate his post-verdict motions, first explaining that the general rule in Pennsylvania at the time was that fugitives have "no right to any appellate review" and then crafting a new rule barring appellate review if (1) the defendant's flight has a connection to the court's ability to rule on the defendant's case and (2) the sanction of dismissing the defendant's appeal is reasonable under the circumstances. *Kindler I*, 639 A.2d at 3.

Kindler then filed for relief under Pennsylvania's Post-Conviction Relief Act (the "PCRA"), 42 Pa. C.S. §§ 9541 et seq. (West 2007), arguing, among other things, that counsel was constitutionally ineffective at the death penalty phase of his trial. The PCRA court denied his petition and the Pennsylvania Supreme Court affirmed, each concluding that

4

Kindler had no right to PCRA review because the Pennsylvania Supreme Court had previously ruled that Kindler forfeited his right to an appeal by escaping. *Kindler II*, 722 A.2d at 146-48.

Kindler then turned to the federal courts for habeas relief. The District Court concluded that the state fugitive forfeiture rule used to dismiss Kindler's post-trial motions was inadequate to bar federal review because it was not "clearly established" that Pennsylvania courts were required to dismiss a fugitive's appeals in situations where the fugitive had fled and been captured before the appellate process was ever initiated. After finding constitutional errors in the penalty phase of his trial, the District Court issued an order granting in part and denying in part Kindler's Petition for Writ of Habeas Corpus. *Kindler III*, 291 F. Supp. 2d at 343, 351-52 (E.D. Pa. 2003). On appeal, we agreed that the rule is inadequate and, upon reviewing the merits, affirmed the District Court's order granting habeas relief on Kindler's claim that the jury instructions violated the Supreme Court's decision in *Mills v. Maryland*, 486 U.S. 367 (1988) and reversed the District Court's order denying habeas relief on Kindler's claims that his counsel was constitutionally ineffective and that he was the victim of prosecutorial misconduct. *Kindler IV,* 542 F.3d at 72.

The Supreme Court then granted certiorari to decide whether "a state procedural rule [is] automatically 'inadequate' under the adequate-state-grounds doctrine—and therefore unenforceable on federal habeas review—because the state rule is discretionary rather than mandatory." *Kindler V*, 130 S. Ct. at 614-15. During the oral argument in the Supreme Court, the parties agreed that the answer to this question was "no." Transcript of Oral Argument at 29-31, *Kindler V*, 130 S. Ct. 612 (2009)(No. 08-992). The Supreme Court thus held that "a discretionary rule can serve as an adequate ground to bar federal habeas review." *Kindler V*, 130 S. Ct. at 618. The court vacated our judgment and remanded for further proceedings consistent with its opinion. With the Supreme Court's holding in mind, we are once again asked by the parties to determine whether Pennsylvania's fugitive forfeiture rule, as applied to Kindler's case, is

5

inadequate, and therefore unenforceable on federal habeas review.

## II.

In its ruling, the Supreme Court stated that the test for determining whether a rule is adequate is whether that rule is "firmly established and regularly followed." *Walker v. Martin,* 131 S. Ct. 1120, 1127 (2011) (quoting *Kindler V*, 130 S.Ct. at 617-18) . Adequacy in this case is determined according to the law in effect when Kindler escaped from prison on September 19, 1984. *See Doctor v. Walters*, 96 F.3d 675, 684 (3d Cir. 1996) (citing *Reynolds v. Ellingsworth*, 843 F.2d 712, 722 (3d Cir. 1988)).

The purpose of the adequacy doctrine is twofold: to ensure that state courts do not set traps for unwary litigants bringing disfavored claims, and to ensure that habeas petitioners have fair notice of what they must do to avoid default. *Campbell v. Burris*, 515 F.3d 172, 179 (3d Cir. 2008). "In applying these principles, this Court seeks to determine whether the state rule itself provides guidance regarding how the rule should be applied or whether such standards have developed in practice." *Id.* (citing *Doctor*, 96 F.3d at 684-85). A state procedural rule consistently applied in the majority of cases, but occasionally overlooked in others, may nevertheless be adequate. *Doctor*, 96 F.3d at 684 (citing *Dugger v. Adams*, 489 U.S. 401, 410 n.6 (1989)). Thus, as we explained in the course of enforcing a state equivalent of the federal plain error rule in *Campbell*,

> [t]he issue is not whether the state procedural default rule leaves room for the exercise of some judicial discretion – almost all do. Rather, the issue is whether, at the relevant point in time, the judicial discretion contemplated by the state rule is being exercised in a manner that lets people know when they are at risk of default and treats similarly-situated people in the same manner.

515 F.3d at 181.

The trial court ruled that the fugitive forfeiture rule was mandatory, i.e., that it was required to dismiss Kindler's post-verdict motions. S.A. 58 (order granting Commonwealth's motion to dismiss Kindler's motions "by reason of his escape from lawful custody and current status as a fugitive from justice."); S.A. 63 (oral ruling that "the defendant did voluntarily remove himself from the Detention Center by escaping and *loses all rights and privileges for post-trial motions*"(emphasis added)); S.A. 73 (opinion noting that the original trial court judge was applying Pennsylvania Superior Court precedent stating that he was "*without discretion* in denying defendant's post-verdict motions as long as he remained a fugitive outside the court's jurisdiction" (emphasis added)). But the same court also believed that it had the discretion to *reinstate* those motions upon Kindler's return to custody. S.A. 74 (opinion describing the standard for review of the denial of a motion to reinstate post-trial motions as "whether the trial court abused its discretion").

Thus, the fugitive forfeiture rule, as articulated by the trial court judges in Kindler's case, mandated that his motions be dismissed, but gave them discretion to reinstate those motions if Kindler asked them to upon his recapture. This curious mix of obligation and discretion created the confusion that has plagued this case—a state that was compounded when the Pennsylvania Supreme Court subsequently set forth the entirely new rule that appellate court review of post-trial motions dismissed on account of a defendant's status as a fugitive is limited to whether the sanction of dismissal is reasonable under the circumstances. *Kindler I*, 639 A.3d at 3.

We have previously concluded that there was no firmly established fugitive forfeiture rule mandating the dismissal of an appeal first filed upon a fugitive's return to custody. *See Doctor*, 96 F.3d at 685-86. In that case, defendant Gary Lee Doctor escaped during the lunch recess of his bench trial for the crime of aggravated assault. Upon his recapture five years later, Doctor filed an appeal to the Pennsylvania Superior Court. That court dismissed the appeal, explaining that by choosing to flee, "Doctor forever forfeited his right to appeal." *Id.* at 684. We understood this language to indicate that the Superior Court believed it had no discretion to consider Doctor's appeal.

Then we surveyed the relevant Pennsylvania Supreme Court decisions to determine whether this was a new rule. In *Commonwealth v. Galloway*, 333 A.2d 741 (1975), the Supreme Court of Pennsylvania addressed a situation in which the defendant had escaped twice – once during the pendency of post-trial motions in the trial court and again during the pendency of an appeal to the Supreme Court of Pennsylvania. Following his initial escape, the trial court dismissed his motions pursuant to the fugitive forfeiture doctrine. After his return to custody and sentencing, the defendant appealed. When the defendant escaped again, the Commonwealth moved to dismiss the appeal. The defendant returned to custody, however, before the Pennsylvania Supreme Court acted on the Commonwealth's motion. The Court denied the motion, explaining:

> The rationale behind dismissal of an appeal while a convicted defendant is a fugitive from justice rests upon the inherent discretion of any court to refuse to hear the claim of a litigant who, by escaping, has placed himself beyond the jurisdiction and control of the court, and, hence, might not be responsive to the judgment of the court.
>
> . . . Since Galloway is no longer a fugitive from justice and is now subject to the jurisdiction of this Court, he will be responsive to any judgment this Court renders. Therefore, this Court has no basis upon which to grant a motion to dismiss the appeal at this juncture.

*Id*. at 743 (citations omitted).

While the *Galloway* Court did not fault the trial court for dismissing the post-trial motions, the absence of rulings on them did not preclude judicial review. It ruled:

> In order to give the trial court the first opportunity to rectify any errors that may have occurred in the trial process, and to aid in clarifying and framing the issues on appeal, we remand the record to the trial court for disposition of the post-trial motions on the

8

> merits. *See Commonwealth v. Grillo*, 208
> Pa.Super. 444, 449 n.1, 222 A.2d 427, 430 n.1
> (1966). Upon remand the trial court is directed
> to consider the issues raised in the "motions"
> filed January 17, 1973.

*Id*.

"After *Galloway*, Pennsylvania's intermediate courts consistently recognized their discretion to hear a properly filed appeal as long as the criminal defendant had returned to the jurisdiction before the appeal was dismissed." *Doctor*, 96 F.3d at 685. Thus, in *Doctor* we concluded that the rule at the time of Doctor's escape was as follows: "if the defendant is returned to custody while his appeal is pending, an appellate court has the discretion to hear the appeal, but if the defendant is returned to custody after the appeal is dismissed an appellate court lacks the discretion to reinstate and hear the appeal." *Id.* Because Doctor's case presented a new situation—he escaped before the appellate process had even begun—we concluded that "it was not 'firmly established' that Pennsylvania courts lacked the discretion to hear an appeal first filed after custody had been restored." *Id* at 686.

Both Kindler and Doctor were subjected to a mandatory rule that stymied their appeals. When the question of adequacy was presented to us previously, we were thus confronted with the sub-question whether the differences between Kindler's case and Doctor's were legally relevant. We concluded that they were not. The procedural default rule applied in Kindler's case was not only not firmly established in 1984 but was directly inconsistent with Pennsylvania law at that time as reflected in *Galloway*. It follows that the rule did not treat Kindler in the same manner as similarly situated individuals would have been treated in Pennsylvania in 1984. Accordingly, we held that Pennsylvania's fugitive forfeiture rule did not preclude us from reaching the merits of this habeas proceeding.[1] Now, on remand, we must determine

---

[1] Contrary to the suggestion of the Commonwealth, *Commonwealth v. Passaro*, 476 A.2d 346 (Pa. 1984), does not support a contrary conclusion. As we noted in our prior opinion, *Passaro* holds only that when an appellate court has

whether the Supreme Court's opinion compels a different result.

## III.

The Supreme Court's review of our prior decision resulted in what it described as a "narrow" holding in response to a "narrow" question of federal habeas law. *Kindler V*, 130 S. Ct. at 619. It held that a discretionary rule can be adequate to bar federal habeas review and then expressly left it to us to decide, on remand, whether the Pennsylvania courts applied a "new rule mandating dismissal," which "constituted a break from past discretionary practice." *Id.* We so decide. Here, just as in *Doctor*, a mandatory rule was not firmly established and was thus inadequate to bar federal review. Our holding in both cases was in no way dependent on a conclusion that discretionary rules are automatically inadequate. To the contrary, we held in our prior decision that the rigid, mandatory, rule requiring dismissal of post-verdict motions was inadequate because it was novel. *Kindler IV*, 542 F.3d at 80. Because the Supreme Court's opinion leaves our prior holding undisturbed, we reaffirm our prior decision.

The Commonwealth protests. It points out that after confirming that the general rule was mandatory, the Pennsylvania Supreme Court distinguished Kindler's case, applied a new, discretionary, rule and then used that rule as the basis for refusing to hear the merits of Kindler's appeal. However, we must look at the law as it was understood at the time of Kindler's escape. *See Doctor*, 96 F.3d at 684 (citing *Reynolds v. Ellingsworth*, 843 F.2d 712, 722 (3d Cir. 1988)

---

dismissed an appeal under the fugitive forfeiture rule in the defendant's absence, it lacks discretion to reinstate the appeal when the defendant is returned to custody. "*Galloway* . . . underscores a critical distinction between dismissed post-verdict motions and a dismissed final appeal. That distinction arises from the fact that after an appeal is dismissed, a court no longer retains jurisdiction. However, appellate courts can exercise jurisdiction after post-verdict motions are dismissed, and they therefore can exercise discretion to hear the claims of defendant's appeal." *Kindler IV*, 542 F. 3d at 79.

(citing *Spencer v. Kemp*, 781 F.2d 1458, 1469 (11th Cir. 1986)(en banc) and *Lumpkin v. Ricketts*, 551 F.2d 680, 682 & n.2 (5th Cir. 1977))). The Pennsylvania Supreme Court was applying a new rule in Kindler's case. This rule obviously did not exist in 1984 and was thus not "firmly established."

Moreover, the rule applied to bar Kindler's appeal was hardly discretionary in the usual sense of the term. The Pennsylvania Supreme Court concluded that its review of the trial court's decision to dismiss the post-verdict motions was "limited to determining whether the flight has a connection with the court's ability to dispose [of] the defendant's case and whether the sanction imposed in response to the flight is reasonable under the circumstances." *Kindler I*, 639 A.2d at 3. This amounts to a mandatory rule with narrow conditions. Worse, in Kindler's case the new rule announced by the Pennsylvania Supreme Court sharply and suddenly skewed the rules in the Commonwealth's favor because the trial court judges applied a mandatory rule to dismiss Kindler's post-verdict motions, even though one of those judges thought "the better practice would have been to consider the post-verdict motions, particularly in light of the death sentence imposed." S.A. 74. Once that initial decision had been made by the trial court, imposing a new appellate standard of review sharply deferential to the trial court's determination simply served to reinforce the mandatory, and inadequate, fugitive forfeiture rule.

The Commonwealth also asserts that the Supreme Court's holding in this matter encompasses the broad proposition that a rule can be adequate, even if its contours are still being developed on a case-by-case basis through the methodology of the common law and even if it is announced for the first time in a defendant's particular case. We disagree. The Supreme Court stated and applied its standard for adequacy—a rule is adequate if "firmly established and regularly followed"—and expressly declined the Commonwealth's invitation to craft a new standard. *Kindler V*, 130 S.Ct. at 617-619; *Walker* 121 S. Ct. at 1127. Under this long-existing standard, a state court decision applying "a rule unannounced at the time of petitioner's trial"—like the mandatory rule applied to bar Kindler's appeal—is inadequate. *Ford v. Georgia*, 498 U.S. 411, 424 (1991). *See*

11

*also Walker*, 121 S. Ct. at 1130 ("[F]ederal courts must carefully examine state procedural requirements to ensure that they do not operate to discriminate against claims of federal rights.").

The Commonwealth's final argument is that, under the Supreme Court's holding, Pennsylvania's fugitive forfeiture rule is adequate because it mirrors the federal fugitive forfeiture rule. In its opinion, the Supreme Court stated that "[t]he States seem to value discretionary rules as much as the Federal Government does," and then remarked that "it would seem particularly strange to disregard state procedural rules that are substantially similar to those to which we give full force in our own courts." *Kindler V*, 130 S.Ct. at 618. But these sentences did not impose a new standard requiring lower courts to first compare state rules to their federal equivalents and then find them adequate if they are "substantially similar." The standard remains whether the state rule is firmly established and regularly applied.

In short, we find the Commonwealth's position unpersuasive. In time, the Supreme Court may reconsider its standard for determining adequacy. But that time has not yet arrived and we are constrained, both by the existing standard requiring that adequate rules be firmly established and regularly followed and by our holding in *Doctor*.

IV.

The rule of procedure applied to Kindler's case, which mandated the dismissal of an appeal based on the claims raised in his post-verdict motions, was a new rule that was not firmly established at the time of his escape. Accordingly, that bar is unenforceable on habeas review. We thus reaffirm our prior decision. In that decision, we reviewed the merits of Kindler's petition and concluded, among other things, (1) that the jury instructions and verdict sheet used during the penalty phase of his trial denied him due process of law pursuant to the Supreme Court's holding in *Mills* and (2) that Kindler was denied effective assistance of counsel during the penalty phase.

The order of the district court granting a conditional writ of habeas corpus and ordering either a new sentencing

12

hearing within 180 days or a sentence of life imprisonment is thus affirmed.

KINDLER v. HORN --  Nos. 03-9010 and 03-9011

STAPLETON, J., *concurring*:

I concur in the judgment of the Court because Kindler was denied appellate review to which he would have been entitled under the law of Pennsylvania as reflected in *Commonwealth v. Galloway*, 333 A.2d 741 (1975), at the time of his escape.

Having once again focused on the Pennsylvania case law in 1984, I also conclude that the rule applied by the Pennsylvania Supreme Court in Kindler's case was not firmly established and regularly followed at that time for an additional reason - Pennsylvania's "relaxed waiver rule" for capital cases.

When Kindler escaped in 1984, the Pennsylvania Supreme Court had issued four opinions in which it had applied the relaxed waiver rule. *See Commonwealth v. Stoyko*, 475 A.2d 714 (Pa. 1984); *Commonwealth v. Frey*, 475 A.2d 700 (Pa. 1984); *Commonwealth v. Zettlemoyer*, 454 A.2d 937 (Pa. 1982); *Commonwealth v. McKenna*, 383 A.2d 174 (Pa. 1978).  That relaxed waiver rule was first invoked by the Pennsylvania Supreme Court in a 1978 case, *Commonwealth v. McKenna*.  There, McKenna was convicted of first degree murder and rape and was sentenced to death for the murder conviction.  On direct appeal, McKenna challenged his conviction but refused to allow his attorney to raise any challenge to the constitutionality of the death sentence because he preferred the death penalty to life imprisonment.   Amicus curiae, however, filed briefs challenging the constitutionality of the death penalty statute

under which McKenna was sentenced.  Although the issue of the death penalty statute's constitutionality was explicitly waived by McKenna, the Pennsylvania Supreme Court declined to apply usual waiver rules and find that McKenna had waived the issue of the statute's constitutionality.

The Court based its decision to reach the constitutional claim "expressly" waived by McKenna on the sentence imposed - death - and the public interest in preventing unconstitutional executions.  The Court explained:

> We recognize . . . that the doctrine of waiver is, in our adversary system of litigation, indispensable to the orderly functioning of the judicial process.  There are, however, occasional rare situations where an appellate court must consider the interests of society as a whole in seeing to it that justice is done, regardless of what might otherwise be the normal procedure.  One such situation is surely the imposition of capital punishment. That this is a unique penalty requiring special jurisprudential treatment is a concept now embodied in the statutory law of this Commonwealth. . . .  This is illustrative of a general proposition that while a defendant may normally make an informed

2

and voluntary waiver of rights personal to himself, his freedom to do so must give way where a substantial public policy is involved; in such a case an appeals court may feel fully warranted in seeking to reach an issue. We have no doubt that this is such a case. Because imposition of the death penalty is irrevocable in its finality, it is imperative that the standards by which that sentence is fixed be constitutionally beyond reproach.

. . . .

The waiver rule cannot be exalted to a position so lofty as to require this Court to blind itself to the real issue the propriety of allowing the state to conduct an illegal execution of a citizen.

In short, where an overwhelming public interest is involved but is not addressed by the parties, the Court has a duty to transcend procedural rules which are not, in spirit, applicable, to the end that the public interest may be vindicated. Such an overwhelming interest insuring that capital punishment in this Commonwealth comports with

3

> the Constitution of the United
> States is present here.

*McKenna*, 383 A.2d at 180-81 (citations and footnotes omitted) (emphases added). The Court thus declined to apply ordinary waiver rules in McKenna's case, found the death penalty statute unconstitutional, and remanded for resentencing.

Four years later, the Pennsylvania Supreme Court again addressed the issue of waiver in a capital case. *See Zettlemoyer*, 454 A.2d at 937. There, Zettlemoyer was convicted of first degree murder and sentenced to death. In his appeal, Zettlemoyer argued, inter alia, that the trial court erred by allowing the Commonwealth to read the indictments of another criminal proceeding to the jury. The Pennsylvania Supreme Court observed that the argument was waived because it was not raised in post-verdict motions. Nevertheless, relying on *McKenna*, the Court addressed the issue on the merits, explaining that it would "not adhere strictly to [its] normal rules of waiver." *Id.* at 955 n.19. Again, the Pennsylvania Supreme Court explained its application of the relaxed waiver rule as based on the nature of the sentence at issue.

In two cases decided less than six months before Kindler escaped, the Pennsylvania Supreme Court again applied the relaxed waiver rule in capital cases. In both, the Court cited *Zettlemoyer* in support of its decision not to find waiver and offered no significant alteration of the rule as announced in *McKenna* and *Zettlemoyer*.

4

The Pennsylvania Supreme Court continued to apply the relaxed waiver rule in capital cases on collateral review until 1998 and on direct review until 2001. Although it is not decisive with regard to determining the established law as of 1984, it is notable that the Pennsylvania Supreme Court thereafter continued to explain the relaxed waiver rule as having been "created to prevent [the Court] from being instrumental in an unconstitutional execution." *See Commonwealth v. Albrecht*, 720 A.2d 693, 700 (Pa. 1998). As of 1984, however, the Pennsylvania Supreme Court had already explicitly and repeatedly stated that its relaxation of its traditional appellate rules in death penalty cases was based on the nature of penalty involved and on the public interest in avoiding unconstitutional executions. Accordingly, it is not surprising that this Court has held that, as of 1981, "*McKenna* . . . rather firmly established that a claim of constitutional error in a capital case would not be waived by a failure to preserve it." *Suzchon v. Lehman*, 273 F.3d 299, 326 (3d Cir. 2001).

As of 1984, the relaxed waiver rule was applied in Pennsylvania to any constitutional claim of any defendant facing the death penalty, and it was not firmly established that a specific type of waiver - fugitive forfeiture - would cause a Pennsylvania court to decline to apply that rule.